## HOLLEY v. GOLDNER SALES CO.
### No. 7851.

Circuit Court of Appeals, Sixth Circuit.
Nov. 17, 1939.

Marston Allen, of Cincinnati, Ohio (Allen & Allen, Marston Allen, and Theodore Greve, all of Cincinnati, Ohio, on the brief), for appellant.

Merrell E. Clark, of New York City (Merrell E. Clark and Paul R. Ames, both of New York City, and Whittemore, Hulbert & Belknap, of Detroit, Mich., on the brief), for appellee.

Before HICKS, SIMONS, and ARANT, Circuit Judges.

ARANT, Circuit Judge.

Appellant sued appellee for infringement of U. S. Letters Patent No. 1,940,628, issued to Thomas J. Litle, Jr., and dated December 13, 1930, which claimed a thermostatically controlled method of utilizing exhaust gases in internal combustion engines, for properly heating the fuel mixture in the intake manifold. Appellee challenged the validity of the patent and denied infringement as well. The District Court held the patent, as it construed appellant's claims, not infringed and did not decide the question of validity. This is an appeal from its judgment dismissing appellant's bill.

Efficient operation of an automobile engine requires that the mixture of gasoline and air be completely vaporized before it reaches the combustion chambers. To attain such vaporization, the temperature of the mixture must be kept within a definite range. In cold weather and at starting, more heat must be applied to attain the required minimum temperature because of the low temperature of the air that is mixed with the gasoline. After the entire engine becomes hot, its heat is sufficient to vaporize the fuel mixture as it passes through the manifold intake into the combustion chambers.

The provision of an automatic means to utilize the exhaust fumes to heat the fuel mixture as long as necessary and to dispense with it when no longer needed has long challenged automobile engineers. Appellant claims that Litle's patent first accomplished this result by the provision of a heater jacket enveloping the intake manifold, into and through which fumes are deflected from the exhaust manifold by means of an unbalanced valve, the opening and closing of which is controlled by a thermostat so positioned as to be at all times exposed to the cooling air from the fan.

Devices for heating the inlet manifold and control of them by both manual and thermostatic means were well known prior to the Litle patent. In addition, while some of the prior thermostatic controls were influenced only by exhaust heat, the Fergus publications in 1925 and the Trussell Patent, No. 1,776,854, filed June 29, 1922, disclosed thermostatic devices that were exposed to both the outside atmosphere, including the direct current of air from the cooling fan, and the heat radiated from the exhaust manifold. The advantage of the thermostat's exposure to the outside atmosphere is that the valve is thereby caused to remain open longer, making the exhaust heat available for vaporization of the fuel mixture until the heat radiated from the whole engine becomes adequate.

The assailed device employs elements corresponding to those of the structure disclosed by Litle's patent to deflect exhaust fumes onto the intake manifold while the engine is warming up and then away when the engine has become so hot that exhaust heat is no longer desirable. The two elements of these devices involved in this suit are the valve which directs the flow of exhaust fumes and the thermostat which controls its movements.

Litle's fourth, fifth, seventh and eighth claims relate to the thermostat. His fourth claim[1] does not differ materially from

---

[1] "4. In an internal combustion engine, power plant consisting of an engine, a cooling radiator and a cooling fan therefor, thermostatic mixture temperature control means comprising an exhaust manifold, an inlet manifold heat-

his fifth, seventh and eighth claims in respect to the position of the thermostat.

█ Some of the claims in Litle's original application specified merely exposure of the thermostat to the outside atmosphere. These were rejected by the Patent Office and thereafter cancelled by the applicant. Claims 4, 5, 7 and 8 were finally allowed upon the incorporation therein of a specification that so positioned the thermostat as to expose it to the air currents from the fan under all conditions of operation.

If, notwithstanding the Fergus and Trussell disclosures, these claims are valid, we are of the opinion, as was the District Court, that, in view of their Patent Office history, they must be confined to an arrangement which definitely exposes the thermostat to the air stream from the fan, as distinguished from one which exposes it merely to the atmosphere surrounding the manifolds. See Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U.S. 38, 40, 14 S.Ct. 28, 29, 37 L.Ed. 989, where the Court said:

"Having originally sought broader claims, which were rejected, and having acquiesced in such rejection, and having withdrawn such claims, and substituted therefor this narrower claim, describing a particular or specific lock, as such, neither the patentee nor his assignees can be allowed, under the authorities, to insist upon such construction of the allowed claim as would cover what had been previously rejected."

See also Mackay Radio & Telegraph Co. v. Radio Corporation of America, 306 U.S. 86, 618, 59 S.Ct. 427, 434, 83 L.Ed. 506.

█ The claims having been thus construed, appellant had the burden of proving that the accused thermostat is so positioned as to be responsive during operation to the air currents from the fan. Between appellee's thermostat and the fan there are air diverting members; and, in addition, the thermostat is protected from the air stream by a cup-shaped cover, the closed side of which faces the fan. From the evidence introduced, which included a demonstration conducted by appellant's counsel, the District Court found that the exposed portion of appellee's thermostat was not reached even by an indirect flow of air from the fan.

Appellant, after quoting certain testimony, attacks the Court's finding, as follows:

"From this logical description it is not believed that anyone could possibly deny that the air under the hood of a running car is a regular hurricane. How is it possible for any ribbons placed under the hood for finding air streams, to hang down or drop anywhere under the hood of the car with the engine running is not understood. Due to this hurricane of air under the hood the air must be blowing around in all kinds of directions and with all sorts of eddies all over the interior of the hood. And it certainly must follow that some of these air streams or some of these eddies must strike and affect the thermostat in both the Litle construction and the Hupmobile construction."

█ We see no reason to question either the correctness of the District Court's finding, or its conclusion of law that appellant's Claims 4, 5, 7 and 8 were not infringed.

But, even if the District Court had found that appellee's thermostat was reached by some of these "air streams" or "eddies," it would not have infringed appellant's claims, as the District Court properly construed them. Had they been construed broadly enough to be infringed by appellee's thermostat because it is exposed to some of the "air streams" or "eddies" under the hood, they would have been invalid, since Fergus and Trussell had previously disclosed thermostatic devices that were exposed to indirect air currents from the fan.

Litle's sixth claim [2] relates to an unbalanced valve that controls the flow of ex-

---

ed thereby, thermostatic means mounted on the outside of the exhaust manifold and exposed under all conditions of operation to the cooling air from the said fan, valve means for controlling the heat effect of the exhaust manifold on the inlet manifold, said valve means being controlled by said thermostatic means."

The other claims describe the thermostat as follows: "positioned in the air stream from said cooling fan under all conditions of operation" (Claim 5), "responsive to air currents created by the fan under all conditions of operation" (Claim 7), and "responsive to said air currents under all conditions of operation" (Claim 8).

[2] "6. In an exhaust heated inlet manifold of the type described, an exhaust manifold, an unbalanced valve in said exhaust manifold, regulating the amount of heat diverted to said inlet manifold, a thermostatic element, means for mounting said element on said valve and anchoring said element to said manifolds, said thermostatic element being adapted to permit said unbalanced valve to oscillate for the purpose described."

haust fumes into the jacket that envelops the intake manifold. Such a valve is constructed by positioning the pivot shaft somewhat off center. The claim specifies the valve as located in, and anchored to, the exhaust manifold in such manner as to be subject to the force of alternate discharges of exhaust gases on its opposite sides, the resulting oscillations of the valve preventing it from sticking.

The unbalanced valve was known in the prior art. It was manually controlled in the old Marmon "hot spot" but thermostatically controlled in U. S. Letters Patent No. 1,824,-926, issued to Frank Pokorny. In the Trussell patent, the valve functions as if it were unbalanced, notwithstanding the fact that the pivot equally divides its surface, because the exhaust force impinges principally the lower half of the valve. In view of this state of the art when Litle's patent was issued, we are of the opinion that the District Court correctly held that appellant's claim is "specifically limited to a construction including 'an unbalanced valve in said exhaust manifold,' together with a thermostatic element and means for 'anchoring said element to said manifolds, said thermostatic element being adapted to permit said valve to oscillate for the purpose described.'"

The valve in appellee's device, which controls the flow of exhaust gases, is positioned differently and functions differently. It is not located in the exhaust manifold but in the passage that leads from the exhaust manifold to the jacket that envelops the inlet manifold. Because of its location, the opposite sides of appellee's valve are not subjected to alternate exhaust discharges that cause it to oscillate but all discharges impinge upon the same side. Moreover, appellee's valve is secured by a toggle spring that resists any tendency there might be to oscillate. The District Court found that "any tendency that might exist for the Hupmobile (appellee's) valve to oscillate in response to motor pulsations and in opposition to the resistance offered by the toggle spring would be insignificant as compared with the major movements of the valve that result from increases and decreases of exhaust pressure in response to throttle changes during ordinary driving."

We are of the opinion that the District Court's conclusion that appellant's sixth claim was not infringed is correct.

Decree affirmed.