**WREFORD et al. v. MACKWORTH G. REES, Inc.**

No. 9828.

United States District Court
E. D. Michigan, S. D.

Feb. 29, 1952.

---

Willis Bugbee, Detroit, Mich., for plaintiffs.

Harness, Dickey & Pierce, Detroit, Mich., for defendant.

PICARD, District Judge.

Plaintiffs bring action for infringement of patent of a split cylindrical type welding cable head used to carry current from welding transformers to welding guns. The claims involved are 7 to 10 inclusive, applicable to the cable head. Admittedly, the accused cable head has been made and sold by defendant since April 18, 1950; notice of infringement received two days later.

The issues to be decided by this court are:

1. Whether defendant's cable head infringes plaintiffs' patent; and

2. Validity of plaintiffs' patent.

Statement of Facts

Spot welding of sheet metal parts is an important cog in the development of modern mass production and assembly line opera-
tions and there has been much progress made in advancing from the stationary machine, to which it was necessary to transport the work, to the present device.

First, the portable machine supplied with high-amperage alternating current from welding transformers, delivering up to 20 volts and connected to the welding guns through welding cables, took the machine to the work. Initially there were two separate conductor cables, one negative—one positive, but these reacted violently to one another and "kicked" leading to the development of a "kickless" cable having the negative and positive conductor encased in one jacket.

Defendant's cable, another step forward, had (and still has) six conductors (three positives alternating with three negatives) and, except for the terminal itself, was all encased in a rubber jacket.

Industry, ever on the alert for improvement, noted that defendant's 1945 cable head, generally recognized as one of the best, was still too heavy and too bulky; in addition it necessitated tearing apart the entire cable head if anything went wrong with this part of the "gun's" mechanism. If it couldn't be fixed at the plant where used the whole welding machine would be out of commission while the head was sent to the manufacturer for repairs.

At about this time in late 1945 one Joseph Baker, employed by defendant's customer, Chrysler, suggested to defendant that it make a smaller and lighter head, and allegedly made a sketch that could easily be the forerunner of both the patented and claimed infringing cable heads.

Plaintiff Wreford was neither a designer nor an engineer for defendant. He was hired in 1933 by M. G. Rees, one of the industry's pioneers, and was foreman of the department where defendant's cable heads were assembled. He claims he knew nothing of the Baker suggestion, and further, that he never saw the Baker drawing.

This Baker drawing, as duplicated at the time of trial, the original having been lost, was for all practical purposes a replica of plaintiffs' cable head embodying the split cylindrical feature, and while we do not doubt the sincerity or the integrity of

Joseph Baker, we note in reading his testimony completely that he is not too certain that he made as complete a drawing in the fall of 1945 as defendant claims he did. We arrive at the conclusion that Baker made a rough drawing and that is all. We doubt whether he had any definite idea of the split cylindrical head as such at that time.

In any event, even if Baker did sketch out a split cylindrical head, the burden of proving that plaintiff Wreford knew about or had seen the Baker drawing is on defendant and we find defendant's proof of such knowledge by Wreford lacking.

The facts also show that plaintiff Wreford was something of an inventor himself and had, a year or two previously applied for a patent on a two-conductor cable head that was not as successful as the Rees head. Rees claims he knew nothing about the first Wreford cable head but everyone else of consequence in Rees' establishment was aware of it and we believe that Rees also knew about it at the time. If Rees didn't know that Wreford was an inventor interested in cables why, as claimed by Rees, did he even discuss the matter with Wreford when his own engineers and designers were trying to solve the problem.

In fact defendant, obtaining the Baker sketch, had immediately started to design a smaller and less bulky cable head but up to 1947 had not succeeded although, according to Rees, Baker actually sketched an outline of the kind of cable head that Wreford supposedly copied.

Thus, we are unable to follow defendant's argument for if Baker made the contribution defendant claims he did, Baker invented the split cylindrical feature of this cable head. Why, therefore, does defendant in another part of its brief claim Newall was the real inventor of the split cylindrical type cable head?

Continuing with the facts we learn that after giving due notice plaintiff Wreford left defendant's employ in September, 1946, to commence production of his own welding cable heads.

Before leaving, however, he got the inspiration for this present cable head "right out of the air" and before the end of the year was showing certain experimental samples to Joseph Baker at Chrysler.

By 1947 plaintiffs' cable head was well known to defendant who, in the meantime, had worked hard to find a way to connect the Rees six-conductor cable to a head that would be lighter, and small enough to allow the wrapper of the cable itself to be drawn over the entire head as in plaintiffs' cable, thereby permitting repairs or changes of parts.

It thus became a race between the two firms, but with this difference. Defendant was trying to attach its six conductors to a desirable terminal not knowing that plaintiffs were trying to do the same thing with Wreford's two-conductor cable. On the other hand plaintiffs were trying to fit their two-conductor cable to a new type of terminal knowing that defendant was experimenting with its original six-conductor cable.

Plaintiffs never tried to attach defendant's six conductors to their cable head. They didn't have to. They were working on their own and they won the contest. In fact plaintiffs had their answer while Wreword was still in defendant's employ. Defendant got its solution after seeing plaintiffs' device and renewed its efforts to do with its six-conductor cable strands what plaintiffs had accomplished with their two conductors.

At this point it is well to note that when plaintiffs received their patent, claims 7 to 10 read as follows:

"the rearward section of said head being substantially cylindrical and the forward section of said head having all portions thereof lying within a cylindrical surface forming a continuation of the cylindrical outer surface of said rearward section."
But after they had a chance to see defendant's cable they asked permission to amend their claims to read as follows:

"the rearward section of said head being *provided with a* substantially cylindrical *portion* and the forward section of said head having all portions thereof lying within a cylindrical surface forming a continuation of the cylindrical outer surface *of*

*said cylindrical portion* of said rearward section."

The italicized words indicate the requested amendments which were rejected by the patent office.

These are the pertinent facts.

### Conclusions of Law
### Infringement

As a matter of law it becomes important that the patent office refused to substitute the requested claims for those that had been granted, because the plaintiffs' claims as set forth in the patent are truly limited to a substantially cylindrical rearward section; not a cylindrical *portion* of the rearward section, but the whole must be substantially cylindrical. Plaintiffs admit that the three prong connection of defendant's terminal definitely is not substantially cylindrical and those prongs are the main part of that terminal's rearward section. The use of the word "portion" was important enough to prompt plaintiffs to make application to have it added to the claims as originally granted and important enough so that the patent office denied the request.

It must be remembered, also, that there is absolutely nothing in the specifications or claims indicating how it would be possible to use defendant's six-conductor cable with plaintiffs' terminal. According to the evidence defendant itself had a major problem devising means for connecting the six conductors to a terminal. At no time has defendant's six-conductor cable been used with plaintiffs terminal and Wreford stated on record that when he made application for the patent in suit he knew of no way to construct a cylindrical terminal that could be used with defendant's cable. "Such limitations as the patentee specifically made in matters of form, structure, and function of the elements of his claim, should not be departed from in determining the question of infringement." Dillon Pulley Co. v. McEachran, 6 Cir., 69 F.2d 144, 146; Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132; Holley v. Goldner Sales Co., 6 Cir., 107 F.2d 494;

Ideal Roller & Mfg. Co. v. Sutherland Paper Co., 6 Cir., 96 F.2d 675; Kenyon v. Automatic Instrument Co., D.C., 89 F.Supp. 602.

Pursuing the question further we find that if we determine that plaintiffs' claims cover a rearward end that is only partially cylindrical then the claims are invalid since they are broader than the invention discloses. Burroughs Adding Machine Co. v. Felt & Tarrant Mfg. Co., 7 Cir., 243 F. 861; State Bank of Chicago v. Hillman's, 7 Cir., 180 F. 732.

We determine, therefore, that the means of connecting the cable strands at the rearward end of the cable head is of major importance and for the reasons cited above defendant's cable head does not infringe plaintiffs' patent.

### As To Validity

Plaintiffs place great emphasis upon the split cylindrical head and an inquiry as to what plaintiffs actually did invent, is necessary.

Did Wreford invent the split cylindrical type terminal?

No, he did not, for three or four years previously, on February 3, 1942, one Heber L. Newall had patented a split cylindrical type resistance welding apparatus which, although not used for the same purpose nor as important as plaintiffs' invention, must be considered as part of the prior art. The split cylindrical type jaw is present as are two electrodes of high resistance material fastened to the jaw and separated by a strip of insulation—the same as in plaintiffs'. The only difference lies in the fact that plaintiffs' split cylindrical or jaw type head leads to the welding gun while in Newall's the welding apparatus is complete without any connecting cable head.

If plaintiff Wreford did not invent the split cylindrical head did he in fact invent a head that would permit the covering of the cable to be removed without disconnecting the terminal from the conductors?

The answer to this must also be no because Rees had patent No. 2,320,470, dated June 1, 1943, a drawing of which showed this feature some three years before Wre-

ford's. This device was not commercially successful for other reasons.

Must plaintiffs' patent therefore fail entirely?

According to defendant's brief whoever invented the original of plaintiffs' terminal is entitled to an invention, and it goes on to claim that Baker is the inventor. We cannot go along with this because we believe that Wreford invented this terminal and doing so effected another great step forward in the industry, because he contrived 1. A streamlined, smaller cable head, less cumbersome, lighter in weight and less expensive due to its lower copper content; 2. A head that could be connected directly to a welding gun without a jumper, by a single bolt, thus reducing loss of current; and 3. A head that had greater flexibility, was more easily adaptable, with greater movability and accessibility.

His invention is not an aggregation but a combination for the "Newall jaw" does not function herein as in the Newall discovery or any other prior art. Wreford contributed to improving the welding art and as stated in Hildreth v. Lauer & Suter Co., D.C., 204 F. 792, if he was the first man to do it as he did, that fact gives him an exclusive right to do it but—and this is important—only in substantially the way he did it. This invention was something new and not simply a product of mechanical skill. It gave rise to new factors and new possibilities.

Defendant's president, M. G. Rees, who has had much experience in this field, was unable, with Baker's almost complete drawing before him, to meet the task until after he had seen plaintiffs' cable head. Only then was he successful in connecting his own six conductors to a split cylindrical cable head.

### Final Conclusion

While we hold that there has been no infringement we have followed the suggestion of the United States Supreme Court set forth in Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 and the February 19, 1952 ruling of the United States Court of Appeals for the Sixth Circuit, Whitman, v. Andrus, 194 F.2d 270 and decided the question of validity. We believe that there is more grounds for attacking the validity than there is for claiming infringement. Mindful of the higher standard placed upon inventability we are nevertheless of the opinion that the plaintiffs' patent is valid but in the very narrow field herein described.