**AVERY et al. v. EVER READY LABEL CORP.**

Civ. No. 989.

United States District Court
D. New Jersey.

May 16, 1952.

914

Harry B. Rook, Newark, N. J., Oscar A. Mellin, San Francisco, Cal., for plaintiffs.

Crummy & Consodine, Newark, N. J., Maxwell James, New York City, for defendant.

MODARELLI, District Judge.

Adhesive Development Co., owner by assignment of Avery Patent No. 2,304,787 for Nondrying Adhesive Labels and Methods and Apparatus for Making Same, brings this suit for infringement against the Ever Ready Label Corporation. The plaintiff limited the charges of infringement to claims 5, 6, 7, 8, 9, and 10 of the patent by stipulation at the pre-trial conference.

In every patent suit, two questions confront the court: "Is the patent valid?" and, "Has there been an infringement?" Recent admonitions of the Supreme Court make clear that the question of validity is of greater public importance, and the better practice for district courts in their disposition of patent suits is to inquire fully into the validity of the patent. Sinclair & Carroll Co., Inc. v. Interchemical Corp., 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644.

The defendant labors against the prima facie evidence of validity which the issuance of a patent affords; this court's inquiry is affected by the presumption. Radio Corporation of America v. Radio Engineering Laboratories, Inc., 1934, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163; Smith, Kline & French Laboratories v. Clark & Clark, D.C.N.J.1945, 62 F.Supp. 971.

The past two decades have marked a re-examination of the standards of patentability adhered to by the Patent Office, as set against the constitutional standards which are supposed to govern. "The primary purpose of our patent system is not reward of the individual but the advancement of the arts and sciences. Its induce-ment is directed to disclosure of advances in knowledge which will be beneficial to society; it is not a certificate of merit, but an incentive to disclosure." Sinclair & Carroll Co., Inc., v. Interchemical Corp., supra, 325 U.S. at page 330, 65 S.Ct. at page 1145. See also Great A. & P. Tea Co. v. Supermarket Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, concurring opinion by Mr. Justice Douglas, and Atlantic Works v. Brady, 1882, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438. As was noted in Magnaflux Corporation v. Coe, 1943, 78 U.S.App.D.C. 258, 139 F.2d 531, that the standards of invention of the Patent Office are below the legal level is indicated by the frequency with which the Supreme Court has overruled the Patent Office on the issue of invention. See for example Electric Cable Joint Co. v. Brooklyn Edison, 1934, 292 U.S. 69, 54 S.Ct. 586, 78 L.Ed. 1131; Textile Machine Works v. Louis Hirsch Textile Machines, 1938, 302 U.S. 490, 58 S.Ct. 291, 82 L.Ed. 382; Lincoln Engineering Co. v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973; Sinclair & Carroll Co., Inc., v. Interchemical Corp., supra; General Electric Co. v. Jewel Incandescent Lamp Co., 1945, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43; and Great A. & P. Tea Co. v. Supermarket Corp., supra.

The Supreme Court's recent attitude as expressed in the cases cited above and others too numerous to cite here has caused the dissenters to claim that the Supreme Court has deviated from well-established doctrines of patent law and may soon abolish the patent system by judicial legislation. I am inclined to the belief, however, that the recent Supreme Court opinions constitute in fact a reaffirmation of the original design of Article I, Section 8, Clause 8 of the United States Constitution. The distinction between mechanical skill, unpatentable; and inventive genius, patentable, was drawn as early as Reckendorfer v. Faber, 1875, 92 U.S. 347, 23 L.Ed. 719. To critics who are startled by what they term

a recent deviation from true principles, I recommend a reading of Atlantic Works v. Brady, supra, decided in 1882.

The records of the Patent Office indicate that it issued a total of 44,363 patents during the calendar year 1951. It taxes one's credulity that our nation, prodigious as it is, could sire so vast a brood of inventions in one calendar year, and if one can extrapolate from past returns, continue at that rate year after year. The situation is particularly incredible when one considers the stringent test of invention which should be applied.

If the Patent Office used more care in applying the tests of patentability as set by the Supreme Court, much of the flood of patent litigation which flows from the tens of thousands of grants would subside and much of the confusion that results from the government's grant of the privilege with its administrative hand and withdrawal with its judicial hand would be avoided.

Title 35 U.S.C.A. § 31, implements the constitutional provision by affording valuable patent rights for invention; but that section has left the standard to patent office regulation and judicial construction. Word definition of a standard of advancement of arts and sciences is difficult and perhaps impossible when divorced from the factual situations immediately under consideration, but words are the imperfect tools of expression and they live on as precedent in opinions of courts as the standards to be employed, ever more lightly resting on the factual foundation of the case as time progresses.

■ Invention has been defined by the Supreme Court as "the flash of creative genius not merely the skill of the calling." No matter how useful a device may be, if it fails to reveal inventive genius it "has not established its right to a private grant on the public domain." Cuno Engineering Corp. v. Automatic Devices Corp., supra. [314 U.S. 84, 62 S.Ct. 41.] See also Mantle Lamp Co. v. Aluminum Products Co., 1937, 301 U.S. 544, 57 S.Ct. 837, 81 L.Ed. 1277; Concrete Appliances Co. v. Gomery, 1925, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222. This court must apply the test to the patent under consideration, keeping in mind:

"Strict application of that test is necessary lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art." Cuno Engineering Corp. v. Automatic Devices Corp., supra, 314 U.S. at page 92, 62 S.Ct. at page 41.

See also Atlantic Works v. Brady, supra, 107 U.S. at page 200, 2 S.Ct. 225.

The claims which are in issue are fully set forth in the margin.[1]

1. 5. The method of making labels which comprises forming a laminated strip of paper, adhesive, and glassine, and dieing out the label through the paper without at the same time dieing out the label shape through the glassine.

6. The method of making labels which comprises forming a laminated strip of paper, adhesive, and glassine, and dieing out the label through the paper without at the same time dieing out the label shape through the glassine, and removing the paper matrix surrounding the died out label and removing therewith the adhesive attached thereto leaving the label and its adhesive on the glassine.

7. The method of making labels which comprises forming a laminated strip of label material, normally tacky adhesive, and thin, flexible, inelastic glassine, dieing out the label shape through the label material without at the same time dieing the label shape in the glassine.

8. The method of making labels which comprises forming a laminated strip of label material, normally tacky adhesive, and thin, flexible, inelastic glassine, dieing out the label shape through the label material without at the same time dieing the label shape in the glassine, and removing the paper matrix surrounding the died out label and removing therewith the adhesive attached thereto leaving the label attached by its adhesive to the glassine.

9. The method of making labels which comprises forming a laminated strip of label material, normally tacky adhesive, and thin, flexible, inelastic lacquered glassine, positioning said strip on an anvil and dieing out the label shape through the label material without at the same time dieing the label shape in the glassine.

10. The method of making labels which comprises forming a laminated strip of label material, normally tacky adhesive,

Claim 5 of the patent reads: "The method of making labels which comprises forming a laminated strip of paper, adhesive, and glassine, and dieing out the label through the paper without at the same time dieing out the label shape through the glassine."

Claim 7 differs from Claim 5 only in that it:

(a) Enlarges the word "paper" to read "label material."

(b) Narrows "adhesive" to "normally tacky adhesive."

(c) Defines glassine as "thin, flexible, inelastic."

(d) Dies out the "label shape" instead of merely the "label," without dieing the label shape "in the glassine" rather than "through the glassine."

Claim 9 is identical with Claim 7, except it:

(a) Adds the adjective "lacquered" to define glassine.

(b) Informs us that after lamination there is a step of "positioning said strip on an anvil."

Claims 6, 8, and 10 are respectively identical to their immediately preceding claims, and in addition add one new step, namely, removing the paper matrix and adhesive surrounding the died out label, leaving the label and its adhesive on the glassine. The language of this addition in these three claims is identical, except for an unimportant variation in Claim 8 which informs us that it is the adhesive which causes the label to cling to the glassine.

In more vivid language, the claims teach a process for manufacturing labels in the following manner: A roll of paper of a type suitable for labels and a roll of lacquered glassine are laminated, or fed together, through a series of rollers. The label paper is coated with an adhesive before it is fed up against the glassine. This is what is meant by "forming a laminated strip of paper, adhesive, and glassine."

Next, this laminated strip, or sandwich as we may call it, of label paper, adhesive, and glassine is fed over an anvil which is nothing more than a flat run of hard metal. A cutting tool, termed a die, descends upon the sandwich. The cutting edge, designed in the shape of the desired label, cuts through the paper and up to but not through the glassine. The scrap paper called the matrix, which remains around the labels, is lifted away from the glassine base and wound around a mill roller for disposal. The scrap lifts onto itself all the adhesive immediately beneath the scrap surface, so that what remains below is a slick roll of glassine spotted with the desired label shapes.

█ The product met with commercial success, which may be an indicia of invention. Its efficacy has been defined as of little effect, but not to be ignored where it is of such proportions as to be "quite astonishing." Minnesota Mining & Mfg. Co. v. International Plastic Corp., 7 Cir., 1947, 159 F.2d 554, 558. More recently the Supreme Court has said that although a device filled a long felt want and has enjoyed commerical success, such success without invention will not make patentability. Great A. & P. Tea Co. v. Supermarket Corp., supra, 340 U.S. at page 153, 71 S.Ct. 127.

The inquiry leads then to an examination of the prior art to determine whether there is an invention here or whether it has been anticipated by the prior art.

1. *The Fox Patent, No. 2,095,437.* The Fox Patent issued October 12, 1937. In that patent a method of making adhesive coated price marking tags was disclosed. The Fox Patent is described in the file wrapper of the Avery Patent:

"In the manufacture of labels, such as in the Fox patent, a laminated strip of label paper, and backing which may be either glassine, cellophane, pliofilm, or holland cloth, is run through a dieing out apparatus. This dieing out ap-

and thin, flexible, inelastic lacquered glassine, positioning said strip on an anvil and dieing out the label shape through the label material without at the same time dieing the label shape in the glassine, and removing the label matrix surrounding the died out label and removing therewith the adhesive attached thereto leaving the label and its adhesive on the glassine.

paratus cuts, perforates, and apertures through all layers." (Letter from attorney for Avery to Commissioner of Patents dated March 17, 1941, and found at p. 79 of the file wrapper.)

Thus the Fox Patent discloses the elements of Avery's first step, "forming a laminated strip of paper, adhesive, and glassine." The distinguishing features between the two patents are that Avery's process:

(a) Does not cut through the backing material of glassine.

(b) Provides for removal of the matrix surrounding the label shape.

In the Fox product, the labels may be removed from the backing material by breaking the perforations around the label. In the Avery product, the label is completely cut out while the backing remains uncut, resulting in cleaner and more efficient removal.

2. *Seal Presses.* Seal presses are printing and embossing machines which have been used for years in this country to manufacture labels and seals. The operation of a particular seal press, the "Germania 4" manufactured by Freiedrich Keese K. G. will serve to illustrate the process: A roll of label paper, adhesively coated on one side, is fed over a continuous rubber coated belt. The belt conveys the label paper to the die which cuts the label shape through the paper but not through the rubber belt. The matrix surrounding the labels is removed. The labels, without any backing material, are led off and the rubber belt which served as the backing continues its endless task of supporting the fresh label paper from the feed to the dieing out operation.

The seal presses teach a method of dieing out labels on a temporary backing material without cutting through that backing. Also involved is the step of removing the matrix. A distinction is found in its choice of adhesives. The seal presses employ a "remoistening" adhesive and may be shipped without a backing material. The product, therefore, is inferior to the Avery product in which a "normally tacky" adhesive permits efficient use without the necessity of moistening the label.

3. *The Price Patent, No. 2,247,252.* The Price Patent issued June 24, 1941. That process is strikingly similar to the Avery process. In the Price method, a roll of label paper and a roll of backing described as "a sheet of fibrous material" are laminated with what Claim 19 describes as "tacky adhesive." This laminated strip is passed through a dieing and printing apparatus which forms the labels by "cutting said articles * * * leaving said other sheet uncut, with the articles in storage positions adhering slightly, by reason of the tacky adhesive, thereto, whereby said articles may be removed when desired from said other sheet and stuck in other desired positions." As in the Avery process, the matrix is lifted and wound around a roller for disposal.

The flow sheets of the Price and Avery Patents prove that the essential steps of each process are the same. Avery's process embodies two decided advantages, however, in that the Avery adhesive and the Avery backing material are superior to that used by Price. Price's fibrous material, such as cardboard, is bulky, unwieldy for handling, and more expensive to ship. Furthermore, the adhesives used by Price are not as tacky and efficient. Indeed if they were, they would cling to the fibrous backing material instead of to the label material when the labels are removed for use.

The evidence introduced at the trial, including Avery's own testimony, indicates that he was familiar with the Price Patent. Unquestionably Avery has refined the Price method of manufacture to yield an excellent product. But in doing so, he rested on the teachings of Fox in adopting glassine as a substitute for cardboard. Fox's teachings are not *inferred* to have been within Avery's knowledge; it is a fact as proven by the Avery Patent's file wrapper history (Avery Patent file wrapper at p. 79). In determining the question of invention, the court may not view the prior art from the eyes of a novice or layman to the particular field under observation. The prior art is viewed as by a mechanic

918

or engineer skilled in the art *sub judice*. Great A. & P. Tea Co. v. Supermarket Corp., supra; Sinclair Co. v. Interchemical Corp., supra; Smith v. Mid-Continent Inv. Co., 8 Cir., 1939, 106 F.2d 622. What may at first blush intrigue or impress the court as a flash of inventive genius often fades after study devoted to educating itself in the processes employed before the instant patent was issued. In truth, Avery, by his own testimony, was an expert, skilled in the art of label making processes. It is the opinion of this court that by skillful application of known methods and apparatus, he has contributed a step forward, an improvement which does not amount to an invention.

The recent trend of cases has made it difficult for a skilled mechanic or engineer of an art to obtain the economic advantages of a patent. Often, as in this case, a competent technician will devise a decided improvement which is of great advantage to the trade. The Patent Office grants a patent. However, due to the high standards of patentability, as set by the courts, protection is withdrawn when suit for infringement arises. These high standards have been criticized as undermining the incentive motive for improving processes and products. Perhaps some economic advantage, less than the seventeen year protection granted for inventions, should be afforded to skilled technicians or engineers who devise improvements which fall short of "inventions."

With this view in mind, I should like to note at least two decisions which may afford a historical basis for such a move:

In Diamond Rubber Co. v. Consolidated Tire Co., 1911, 220 U.S. 428, at page 435, 31 S.Ct. 444, 55 L.Ed. 527, the Supreme Court, divided patents into two groups:

(a) *Primary*—an invention which is broadly new, pretentious, subjecting all who come after to pay tribute.

(b) *Secondary*—an invention which is a successor in a sense of all that went before, a step only in the march of improvement and limited, therefore, to its precise form and elements. The secondary invention, in its narrow and humble form, may not excite our wonder as may the broader or pre-

tentious form, but it has some right to protection. Nor does it detract from its merit that it is the result of experiment and not the instant and perfect product of inventive power.

In Smith v. Mid-Continent Inv. Co., supra, 106 F.2d at page 624, the court, in effect, recognized degrees of invention in that it applied different standards for construing the claims. "If the discovery revealed and claimed is in a new field of endeavor or is a pronounced journey forward in an art, then the claims are entitled to be liberally construed, resulting in a wide range of equivalents; but if the discovery is in a crowded art and is merely a mincing step forward, the claims are restricted to a narrow range to avoid trespass upon the domain of others or of the public. McKays Co. v. Penn Elec. Switch Co., 8 Cir., 60 F.2d 762, 766."

It is the decision of this court that the Avery Patent is invalid. The question of infringement need not, therefore, be considered.

An order may be submitted in conformity with the opinion herein expressed.