**JOSEPH BANCROFT & SONS CO. v. BREWSTER FINISHING CO., Inc.**

Civil Action No. 435–51.

United States District Court
D. New Jersey.

July 14, 1953.

As Amended July 16, and Aug. 25, 1953.

William H. Campbell, Jr., Newark, N. J., Synnestvedt & Lechner, Philadelphia, Pa., by Alfred C. Aurich and William H. Elliott, Jr., Philadelphia, Pa., for plaintiff.

Harry Sommers, Newark, N. J., by Benjamin Sweedler and Ira J. Schuster, New York City, for defendant.

MODARELLI, District Judge.

This is an action arising under the Patent Laws. The plaintiff, a Delaware corporation, charges that defendant, a New Jersey corporation, has infringed Claims 2 and 3 of United States Letters Patent No. 2,121,005, issued June 21, 1939, to Christian Bener, assignor to Raduner & Co. A.-G., Horn, Switzerland.

Raduner & Co. A.-G., assigned an undivided one-half interest in the patent to the Calico Printers Association Limited of Manchester, England, on October 19, 1943. The assignment was recorded in the United States Patent Office on December 31, 1943. Raduner and Calico assigned all right, title, and interest to plaintiff on February 14, 1949. This assignment was recorded in the United States Patent Office on April 20, 1949.

The Bener Patent in suit teaches a process of imparting a durable mechanical finish to goods, durable in that it is relatively fast to repeated dry cleanings or washings. Plaintiff limits its action for infringement to Claims 2 and 3 of the patent. Claim 2 of the patent deals with the process.[1] Claim 3 of the patent covers the product.[2] Before examining the prior art, the court must dispose of three questions of law.

I. Bener is Entitled to a Filing Date as of October 14, 1933, the Date of Filing of the Swiss Application.

The Bener United States application was filed October 4, 1934, and the patent issued June 21, 1938. Plaintiff claims it is entitled to a filing date of October 14, 1933, the date of filing of a Swiss application No. 3101 by Raduner & Co. A.-G., covering substantially the same invention.

R.S. § 4887, 35 U.S.C. § 32, provided that an application for a patent in this country by any person who had previously filed for a patent for the same invention in a foreign country which by convention affords similar privileges to citizens of the United States "shall have the same force and effect as the same application would have if filed in this country on the date on which the application for patent for the same invention * * * was first filed in such foreign country." This section was repealed on July 19, 1952, although the first paragraph of Section 32 still applies to unexpired patents granted prior to January 1, 1953. Corresponding provisions are set forth in the 1952 revision of the Patent Act, 35 U.S.C. §§ 102(d), 119, and 172. It is noted that the second paragraph of Section 119 of the Code does not apply to patents existing on January 1, 1953, but this is not a factor in my determination.

A study of the Swiss and United States applications shows that they cover substantially identical processes and products. Although defendant, at page 61 of his brief, alleges that the Swiss patent does not teach the process of Claim 2 of the Bener United States, at page 3 of his Proposed Findings of Fact and Conclusions of Law, Article 8, defendant states that the two patents make substantially the same disclosure. The question remains: Was the Swiss application made by the same person as the United States application? The Swiss applicant was Raduner & Co. A.-G.

1. "2. Process of producing calender finishes on cellulose textile fabrics, comprising impregnating the fibers of the fabric with an aqueous resin-forming solution, capable of reaction to increase the resistivity of fibers impregnated therewith against flexion; drying the fibers slightly or to a moist condition; and then changing the form and relative disposition of the fibers to impart to the slightly moist fabric an ornamental texture by means of a heated calender; and thereupon subjecting the fabric to a heat treatment at a temperature and for a period of time that will harden the resin completely up to the final state without deterioration of the fabric, and in which the calender finish becomes permanently fast to washing."

2. "3. The product of the process of claim 2 being a cellulose textile fabric with a calender finish effect fixed by heat hardened resin and characterized by the quality that the calender finish is substantially permanent and will withstand washing with soap and water without substantially losing the calender effect."

The United States application was filed by Christian Bener. Plaintiff claims the Swiss application was made by Raduner on behalf of Bener, and as evidence of identity of the applicants, plaintiff submits the oath found in the file wrapper of Bener's United States application, page 18. Bener's oath states that no application has been "filed by him or his legal representatives or assigns in any country foreign to the United States, except * * * in Switzerland, filed October 14, 1933. Application No. 3101 * * * (filed in the name of Raduner & Co. A.-G., of Horn Switzerland)." In the case of Michelin v. Hayes Wheel Co., D.C.Mich.1924, 300 F. 458, under similar circumstances the court held such evidence sufficient to make the foreign application part of the United States application and the plaintiff's claim to the prior foreign filing date was upheld. Defendant cites the case of Grasselli Chemical Co. v. National Aniline & Chemical Co., 2 Cir., 1928, 26 F.2d 305. There plaintiff presented evidence which it alleged proved that the United States applicant had previously filed for a patent in Germany for the same invention. The evidence showed only that the United States applicants had in their own handwriting made some corrections on the German drafts. It was held that this evidence did not prove that they were the inventors of the German product and the court did not permit the plaintiff to carry back the date of the invention. In the present case, however, we have the inventor's oath attesting that the foreign application was filed by himself or his legal representatives. That oath was taken by Bener on September 26, 1934, almost seventeen years before this suit was filed. That it was sworn to in conspired anticipation of this suit is unlikely.

▪ The court considers the plaintiff entitled to take advantage of the Swiss filing date of October 14, 1933. It should be remarked that under this court's analysis the outcome is not dependent upon the question of whether plaintiff should be allowed to carry back to the Swiss filing date.

## II. The Abandoned Lantz and Morrison United States Application is Not to be Considered.

Messrs. Lantz and Morrison filed a United States application for a patent on a process for "Glazing, Embossing and Finishing of Textile Fabrics." The Lantz and Morrison United States application was filed two days before the United States Bener application. Lantz and Morrison United States was filed on October 2, 1934; Bener United States was filed on October 4, 1934. The Lantz and Morrison application was later abandoned; a United States patent never issued. Our intention is focused then on the question: Is an abandoned application a part of the body of prior art?

This is not a question of novel impression. In Monarch Marking System Co. v. Dennison Mfg. Co., 6 Cir., 1937, 92 F.2d 90, it was held that an abandoned application is not proof of prior invention:

"We fail to find that Ritscher was anticipated by Heyerdahl. Heyerdahl was granted a British patent, No. 29,-503, November 5, 1914, upon an application filed December 22, 1913. The application date of Ritscher was March 24, 1913, but Heyerdahl had filed an application in the United States Patent Office on January 30, 1913. This was, of course, earlier than Ritscher's application, but the Heyerdahl application was forfeited and abandoned and is not proof of prior invention. * *" 92 F.2d at pages 92, 93.

▪ The rule is somewhat mollified by the fact that if the subject of an abandoned application was *reduced to practice* in this country, then the abandoned application itself is admissible as evidence of prior knowledge of the technique. U. S. Blind Stitch Mach. Corp. v. Reliable Mach. Works, Inc., 2 Cir., 1933, 67 F.2d 327. See particularly pp. 328–329. See also Journal of the Patent Office Society, Vol. 28, No. 3, Page 160. Defendant states in his brief that the Lantz and Morrison British Patent No. 425,032, filed June 6, 1933, and covering the same process, indicates an intention of mak-

ing the invention available to the public. Defendant states further that they would, in fact, make the invention available to the public. But it does not follow, therefore, that the subject of the abandoned United States application *was* made available to the public. We note also Interurban Ry. & Terminal Co. v. Westinghouse Electric & Mfg. Co., 6 Cir., 1911, 186 F. 166. That court quotes from Walker on Patents, 4th Edition, c. 3, Section 58:

> "Novelty is not negatived by any prior abandoned application for a patent. Abandoned applications for patents are not, by the statutes, made bars to patents to later applicants. They furnish no evidence that the processes or things they describe were ever made or used anywhere. Being only pen and ink representations of what may have existed only as mental conceptions of the men who put them upon paper, they do not prove that the processes or things which they depict were ever known in any country. Nor can they be classed among printed publications, for they are usually in writing, and are not published by the Patent Office." 186 F. at page 168.

██ The court holds that the abandoned United States application by Lantz and Morrison is not to be considered in a study of the prior art to determine the validity of the Bener Patent in suit.

### III. Lantz and Morrison British Application No. 425,032 Cannot be Considered as Prior Art.

Bener United States was filed October 4, 1934. Prior to that date, Lantz and Morrison filed their provisional specifications in Britain, to wit, on June 6, 1933. The complete specifications were filed on June 20, 1934, and the British Patent accepted on March 6, 1935. The important sequence to note is that the Bener United States application was filed before the Lantz and Morrison British Patent was accepted, or issued, as we term it.

R.S. § 4923, 35 U.S.C. § 72, read:

> "Whenever it appears that a [United States] patentee, at the time of making his application for the patent, believed himself to be the original and first inventor or discoverer of the thing patented, the same shall not be held to be void on account of the invention or discovery, or any part thereof, having been known or used in a foreign country, before his invention or discovery thereof, if it had not been *patented or described in a printed publication.*" (Emphasis Supplied.)

According to this section, an application in a foreign country does not suffice to establish priority of invention over a United States application. The foreign patent must have issued or a description published. The wording is clear. There is nothing in the legislative history of the Act that indicates any intention other than the plain meaning of that section. In fact, Mr. Lanham's Report on the Bill for the Committee on Patents recorded in U. S. Code Congressional Service, 79th Congress, Second Session 1946, page 1498, states:

> "* * * It is deemed preferable to refuse evidence of foreign activities; *not published or patented,* in all cases, as this is the greater convenience in trials and other proceedings held in this country. It is pointed out in the hearings that this change is more in line with foreign laws, since foreign countries pay no attention to acts done outside of their own borders." (Emphasis Supplied.)

The Patent Code Act of July 19, 1952, c. 950, 66 Stat. 792, became effective January 1, 1953. The Patent Code, 35 U.S.C. § 102 reads:

> "A person shall be entitled to a patent unless—
>
> "(a) the invention was known or used by others in this country, or *patented or described in a printed publication in this or a foreign country,* before the invention thereof by the applicant for patent". (Emphasis Supplied.)

The crucial words are the same under the code as under its earlier counterpart, 35 U.S.C. Section 31.

In Westinghouse Mach. Co. v. General Electric Co., 2 Cir., 1913, 207 F. 75, the court following 35 U.S.C. Sections 31 and

72 held that "for the purpose of defeating a patent application, reduction to practice in a foreign country is a nullity unless the invention is patented or described in a printed publication." 207 F. at page 77. The court stated further 207 F. at page 78:

"\* \* \* As we construe this section, reduction to practice in a foreign country can never operate to destroy a patent applied for here, however widely known such reduction to practice may be, either among foreigners or among persons living here, unless the invention be patented or described in a printed publication. To that extent section 4923 [35 U.S.C. § 72] qualifies the language of section 4886 [35 U.S.C. § 31], which without such qualification might well lead to a different result." To like effect: Vacuum Engineering Co. v. Dunn, 2 Cir., 1913, 209 F. 219.

■ The court holds that the Lantz and Morrison British application does not establish prior invention with respect to the Bener application later filed in the United States Patent Office.

■ These controverted legal issues having been disposed of, we turn to the question of the validity of the Bener Patent. Better procedure requires a consideration of the question of validity before inquiry as to the alleged infringement. Due regard is given to a presumption of validity. Sinclair & Carroll Co., Inc. v. Interchemical Corp., 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Radio Corporation of America v. Radio Engineering Laboratories, Inc., 1934, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163. The Bener Patent teaches a method of obtaining durable calender finishes on fabrics through four sequential steps:

1. Impregnating the fibers of the fabric with an aqueous resin-forming solution.

2. Drying the fibers slightly or to a moist condition.

3. Changing the form and relative disposition of the fibers to impart an ornamental texture by means of a heated calender.

4. Curing or hardening the resin by a heat treatment.

Keeping in mind this broad outline of the Bener Patent, we now examine it in more detail.

The Bener specifications acknowledge that prior to the Bener application fabrics were rendered resistive against wrinkling by introducing artificial resins into the interior of the fibers. Bener proposed to change the form and relative disposition of the fibers by calendering after impregnation to impart to the fabric various ornamental textures. These textures stand out in bold relief if the calender roll is engraved, or if the fabric is passed through a Schreiner-calender. Stamping calenders are also suggested, as are smooth calenders for obtaining gloss effects. A broad range of artificial resins, fast to light, odorless and colorless, are suggested. Carbamide-aldehyde resins, urea and thiourea condensation products alone or in combination with sizing or filling materials, are mentioned, and certain specific formulations are set forth, viz.: A 20% aqueous solution of carbamide resin containing 0.5% tartaric acid when treating cotton muslins. A 25% solution of dimethyl-urea for cottons. A solution of 225 grams dimethylol-urea and 75 grams thiourea with 2% boric acid for satins.

The resin-impregnated fabric leaves the calender with the ornamental design impressed. If the resins are now cured, i. e., hardened, the design is rendered durable. The curing is effected by known methods, i. e., passing the fabric over heated calenders or drying cylinders or through a heated drying chamber.

Much argument and testimony was heard on the question of whether or not the resin-impregnated fabric could be simultaneously calendered and cured. The resin is cured by heating. It matters not how that heat is applied by passing the fabric through heated rollers, tins, or a drying chamber. The curing takes from two to five minutes, the time element obviously varying with the temperature of the heating device. The curing process starts the moment heat is brought to bear on the resin. If the calender which is used to impart ornamental textures on the fabric is hot, then perforce the curing process *starts* simultaneously with

the calendering step, although the cloth may be in contact with the calender roll for only a moment. For example, in the Silver Patent No. 2,593,207, one of the many patents discussed during the course of the trial, the fabric passes through the embossing rolls at a speed of approximately fifteen yards a minute. Though curing may start with the calender roll, that function is incidental; the fabric must be subjected to continuous heat by passing it through a series of heated rollers or a drying chamber. It is a bit disappointing to hear patent attorneys, who must know and understand the process from their study of the art, cast at each other charges of unclean hands, bad faith, or half truths, when it must be obvious to all concerned that the phrase "simultaneous calendering and curing" means that the two operations may be effected on the same instrumentality and that the first heated roll, which in some cases is the calender roll, may in addition to calendering, simultaneously start the curing process. A trifle more objectivity would assist the court, rather than present it with secondary problems.

Defendant argues that the Bener Patent cannot be construed to cover a process for obtaining embossed effects. The patent, however, clearly shows that the prime achievement claimed is the attainment of durable relief patterns. Although the word "emboss" is not used, equivalent terms are, e. g.:

"ornamental texture" (p. 3, col. 1, line 14, and p. 3, col. 2, line 6),
"stamping effects" (p. 1, col. 1, line 5),
"artificial effects" (p. 1, col. 1, line 20),
"change their surface or form" (p. 1, col. 1, line 42),
"The pattern is distinctly stamped into the fabric" (p. 2, col. 1, line 63),
"a damask-effect" (p. 2, col. 2, line 42),
"relief stamping" (p. 2, col. 2, line 63).

We turn now to a study of the prior art.

On June 1, 1928, British Patent No. 291,-474, issued to Tootal, Broadhurst, Lee Company Limited, hereinafter referred to as the TBL Patent, for the production of improved cotton or linen fabrics. The object of TBL was to impart to such materials "the property of non-creasing or non-crumpling * * * so that this property is not substantially destroyed by washing." Example 1 of the complete specifications (amended) of TBL discloses a seven-step process for achieving a wrinkle proof finish:

1—impregnating the cotton fabric with caustic soda;

2—squeezing or centrifuging to remove excess liquor;

3—without washing the fabric, running it into a reaction mixture containing synthetic resin components of phenol and formaldehyde solution and a catalyst;

4—after suitable impregnation, squeezing the fabric and drying with or without tension;

5—*after drying* treating the fabric with a solution of 40% formaldehyde;

6—drying without washing;

7—thereafter suitably heating by means of calenders, drying tins or the like in a drying stove until completely dry at 180° C. for 2 to 5 minutes.

Steps 1 and 2 are pre-treatment steps. These steps are alluded to in Bener at p. 2, col. 1, lines 46–48. They are not pertinent to this study. Step 3 parallels Bener's first step of impregnating the fabric with a resin solution. TBL then dries the fabric, treats it with a solution of 40% formaldehyde, dries it again, then cures the resin by subjecting the fabric to a heat treatment. TBL's Example 2 does not require the treatment with 40% formaldehyde (Step 5 above).

The important difference between Bener and TBL is apparent. TBL is not concerned with imparting a mechanical finish to the goods. The idea of impregnating fabrics with resins, the basic component of both processes, is disclosed by TBL and the result achieved is fundamentally the same, i. e., it freezes the fibers so that their relative disposition is unaffected by handling or washing. This freezing or fixing of the fibers accomplishes for TBL a resistance to wrinkling due to handling or washing; it accomplishes for Bener a resistance to loss of the mechanical finishes imparted by

calenders. I emphasize that in both cases the desired result depends upon impregnation of fabric with resin and freezing, or curing or hardening, as you will, the resin to fix their relative disposition.

The Heberlein French Patent No. 749,117 is next in importance. The United States Zanker Patent No. 1,925,914, issued September 5, 1933, is the United States counterpart of the Heberlein Patent. Heberlein is addressed to the problem of rendering fabrics wrinkle resistant. The fabric is run through a solution of resins or gums in the presence of salts, oxides, or hydroxides of bivalent or polyvalent metals. The metal compounds are absorbed by the fiber. The specifications and claims make clear that the resins and metals do not penetrate the fibers. Heberlein recommends that artificial resins may be used, such as, phenols, aldehydes, or substances obtained from urea and aldehydes. Example 4 of Heberlein teaches a process of running cotton fabric through an aluminum acetate solution, thence through a solution of urea and formaldehyde. The fabric is dried, by running it through rollers and allowing it to stand for a time, then calendered. Heberlein differs from Bener in that the latter calls for impregnation of the fibers by the resins, while the former states the resins and metals are adsorbed as distinguished from absorbed. Detailed expert testimony and exhibits of microscopic photographs of fibers which had been soaked with resin failed to clearly establish to the court's satisfaction whether or not this distinction apparent in the printed word actually prevailed in practice. The essential aspect here, however, is the use of resins to impart a resistance to wrinkling, the resins being cured to prevent a change in the relative disposition of the fibers. As in TBL, so in Heberlein, an ornamental texture is not imparted to the fabric before the fibers are locked in place by curing the resin.

Pertinent also is British Patent No. 258,-357, applied for by Rossiter and Davis, and accepted September 20, 1926. Rossiter and Davis teach a process of impregnating fabric with an aqueous solution of formaldehyde or thiourea, then condensing the resin by addition of acid or acid salts. In a sug-gested example (p. 2, col. 2, lines 54–64), the goods are then partially dried by passing through a wringer. The resins are finally brought to an insoluble state by heat applied by hot rolls or other devices. Here again the essential elements of Bener are taught, with the exception of imparting a mechanical finish to the goods. For similar teachings see United States Patent No. 1,-734,516, issued November 5, 1929, to Foulds.

As early as March 4, 1884, however, a United States Patent No. 294,731 issued to Claude Garnier for the "Manufacture of Embossed Fabrics." Garnier's method parallels Bener's, though the impregnating solutions differ somewhat. In Garnier's Example 1 the fabric is:

1. Impregnated with a solution of egg albumen.

2. Dried.

3. Embossed between heated rolls.

4. Coagulated or fixed by immersion in alcohols or acetic acid.

Example 1 of Garnier embodies identical sequential steps as Bener. The fabric is impregnated with egg albumen, then dried, then embossed, and then fixed. Bener merely substitutes an aqueous solution of a thermosetting resin in place of egg albumen. But in Example 2, Garnier specifically teaches that resins may be used in his process. There Garnier suggests impregnating the fabric with a solution of gum-lac, drying, then embossing between heated rolls. The embossed fabric is next immersed in a resin solution or a solution of hard copal amber, Zanzibar, Demerra, or Sierra Leone gums. The Garnier process involves imparting an ornamental design to the fabric itself, not merely the coating. The resin "takes itself, at the same time with the fabric, the exact impression of the designs engraved on said cylinders, preserving the said impression in cooling." (p. 1, col. 2, lines 51–54.)

Two further patents can be cited which teach embossing or imparting a mechanical finish to fabrics. Cadgene, No. 1,978,407, applied for October 6, 1933, and issued October 30, 1934, teaches impregnating fabric with synthetic or natural resins, pressing between rollers, then creping the fabric

before allowing the resin to fix. Here again men skilled in the art, employing essentially the steps later claimed by Bener, used natural or synthetic resins to affect fabrics with durable mechanical designs.

Passing reference is made to Wilson, No. 1,352,163, issued September 7, 1920, which produces water-proof, embossed fabric by coating the material with rubber, running through embossing rolls, then vulcanizing to fix the design on the rubber coating.

Detailed analysis of the patent in suit and the more pertinent patents of the prior art has been made. In brief, the state of the art prior to Bener can be stated thus:

In the textile processing industry, the art of impregnating fabrics with thermosetting resins, then curing to effect a reasonably permanent relative disposition of fibers, was well known prior to Bener, viz., TBL, Rossiter and Davis. Heberlein achieved the same effect, but claimed the resins and metals were adsorbed by rather than absorbed into the fibers in his process. Known too were processes of embossing fabrics impregnated with egg albumen or various natural or synthetic resins, viz., Garnier and Cadgene. The art of embossing coated fabrics was long practiced before Bener, e. g., Wilson.

█ One skilled in the art of textile processing could readily achieve Bener's process and product from a study of Garnier's process for embossing textiles using egg albumen or certain resins, and from a study of the sequential steps and suggested resins of TBL, Heberlein, and Rossiter and Davis. A patentee is presumed to know and is chargeable with knowledge of everything disclosed by the prior art. Zephyr American Corporation v. Bates Mfg. Co., 3 Cir., 128 F.2d 380; Cutler Mail Chute Co. v. Capitol Mail Chute Corporation, 2 Cir., 118 F.2d 63; Detroit Stoker Co. v. Brownell Co., 6 Cir., 89 F.2d 422.

On January 1, 1953, the new Patent Code became effective. Section 103 of the Act reads:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differ-ences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been *obvious at the time the invention was made to a person having ordinary skill in the art* to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." (Emphasis supplied.)

█ Legislative history indicates that Congress did not intend to formulate a new standard of invention:

"Section 103, for the first time in our statute provides a condition which exists in the law and has existed for more than 100 years, but only by reason of decisions of the court. An invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent. * * * That provision paraphrases language which has often been used in decisions of the courts, and the section is added to the statute for uniformity and definiteness." Report of the Senate Judiciary Committee.

The Third Circuit has expressed the opinion that Section 103 merely codifies decisional patent law. Stanley Works v. Rockwell Mfg. Co., 3 Cir., 1953, 203 F.2d 846, 849.

The Sixth Circuit has also stated that the Code has done no more than adopt the test of so-called obviousness which has been enunciated by the courts in the past, that it did not provide a new test. General Motors Corp. v. Estate Stove Co., 6 Cir., 203 F.2d 912. To like effect see Thys Co. v. Oeste, D.C.N.D.Cal.1953, 111 F.Supp. 665, 673, and In re O'Keefe, C.C.P:A., 202 F.2d 767. In view of these authorities, the court's interpretation of the standard set by the Patent Code is affected by decisions rendered prior to the effective date of the Code.

█ This court has recently stated in detail its interpretation of court enunciated

standards of patentability. Avery v. Ever Ready Label Corporation, D.C., 1952, 104 F.Supp. 913. The Third Circuit has recently recorded its view. Packwood v. Briggs & Stratton Corp., 3 Cir., 1952, 195 F.2d 971. Detailed restatement and citation of that which has been recorded previously would serve no useful purpose. Exercise of mechanical skill by one familiar with the art, the combining of known methods to attain the result, falls short of "inventive genius." Mantle Lamp Co. v. Aluminum Co., 1937, 301 U.S. 544, 57 S.Ct. 837, 81 L.Ed. 1277; Reckendorfer v. Faber, 1875, 92 U.S. 347, 23 L.Ed. 719.

The Bener process and product represent an adaptation of known methods obvious to one skilled in the art; they lack patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Sinclair & Carroll Co. v. Interchemical Corp., supra; Smith v. Mid-Continent Inv. Co., 8 Cir., 1939, 106 F.2d 622; and Detroit Gasket & Mfg. Co. v. Victor Mfg. & Gasket Co., 7 Cir., 1940, 114 F.2d 868.

▉ Plaintiff points to immediate commercial success of his process and product as an indicia of invention, alleging the owners of the Bener Patent received $2,763,879.03 in license and royalties fees from 1947 to 1952. The significance of this statistic has been disputed by defendant. Accepting the figure, however, "commercial success may be resorted to as evidence of invention only where other facts leave the question of invention in doubt." Walker on Patents, Deller's Edition, Vol. I, (1937), p. 236. Such is not the case here.

"Numerous licenses under the patent were issued in the United States and other countries. The fact that this process has enjoyed considerable commercial success, however, does not render the patent valid. It is true that in cases where the question of patentable invention is a close one, such success has weight in tipping the scales of judgment toward patentability. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 594, 595, 88 L.Ed. 721, and cases cited in footnote 5 thereof. Where, as here, however, invention is plainly lacking, commercial success cannot fill the void [citations] * * *. Commercial success is really a makeweight where the patentability question is close." Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, 567, 69 S.Ct. 269, 272, 93 L.Ed. 235. See also Great Atlantic & Pacific Tea Co. v. Supermarket Corp., supra; Minnesota Mining & Mfg. Co. v. International Plastic Corp., 7 Cir., 1947, 159 F.2d 554.

▉ This court holds that Claims 2 and 3 of the patent in suit are invalid because of prior-art anticipation and lack of invention. An invalid patent cannot be infringed.

The foregoing opinion shall constitute findings of fact and conclusions of law, as required by Fed.Rules Civ.Proc. rule 52, 28 U.S.C.

Judgment may be entered dismissing the plaintiff's complaint, and determining under defendant's counterclaim that all claims of the patent in suit are invalid. The defendant is entitled to recover court costs but not costs of suit.