Richard A. FISCH and Anchor Plastics Co., Inc., Plaintiffs,

v.

William GOULD, trading as Stay-Rite Supply Co., and Keystone Plastics, Inc., Defendants.

Civ. A. No. 285–51.

United States District Court
D. New Jersey.

May 14, 1956.

MODARELLI, District Judge.

This is a patent action. Plaintiffs are Richard A. Fisch, who is the assignee of Patent No. 2,531,234 for "Longitudinally Separable Extruded Thermoplastic Strip and Process of Producing Same,"[1] and Anchor Plastics Co., Inc., Fisch's exclusive licensee of the patent. The application for the patent was filed on July 21, 1949, and issued on November 21, 1950, to Peter H. Seckel. Plaintiffs allege that William Gould, trading as Stay-Rite Supply Co., and Keystone Plastics, Inc., are infringing the patent by making, using, and selling strips embodying the patented invention and by employing a process for producing the material embodying the patented invention. Plaintiffs demand that defendants be enjoined from infringing and that plaintiffs receive an accounting and damages. The defense is that the patent is invalid for lack of invention; defendants also counterclaim for damages based upon alleged unfair competition by plaintiffs in threatening to sue defendants' customers for infringement.[2]

At the beginning of the trial, plaintiffs limited their charge of infringement to Claims 2 and 7 of the patent. The counterclaim, however, requires an adjudication of all of the claims except numbers 3 and 6, which the parties agree are not involved. Since defendants admit infringement, the only issue is whether Claims 1, 2, 4, 5, and 7 are valid.[3]

Otto Cooper, Union City, N. J., Greene, Pineless, Callmann & Durr, by Orville N. Greene, New York City, of counsel, for plaintiffs.

Smith, Slingerland, Trauth & Holtz, by David Trauth, Churchill, Rich, Weymouth & Engel, by Howard J. Churchill and Robert M. Freeman, New York City, for defendants.

1. "The thin strips are very useful as corset stays and similar stiffening reinforcements for ordinary or protective wearing apparel or in any material which is apt to be subjected to repeated flexing." Col. 2, line 15. " * * * the strip will withstand an unusual number of * * * severe flexings without separating." Col. 3, line 23. Commercially, the product has been marketed as a brassiere stay known as "Bonar."

2. Defendants concede there is insufficient evidence to support their counterclaim; they contend, however, that "Plaintiffs' conduct * * * of trying to dissuade the defendants from contesting the same [this action] by threats against customers, a separate suit against a customer, by notices to the trade and suggestions of disproportionate litigation expenses—having in mind that the patent in suit covers something which is completely devoid of novelty and invention—shows bad faith and warrants the award of counsel fees to defendants under 35 U.S.C.A. § 285." Defendants' Proposed Findings of Fact and Conclusions of Law No. 29.

3. "1. A process of producing strip material which has a homogeneous appearance but separates into a plurality of filaments when sharply bent comprising the steps of mixing two non-compatible, fiber, forming, linear-polymeric, thermoplastic materials, plasticizing said mix, and forcing the mix containing two separate solid phases through a single orifice die and withdrawing the extruded product from the die without substantially

The objects of the patent are: (1) To provide a process for manufacturing a length of extruded material; (2) having unusual longitudinal tensile strength and unusual resistance to tearing transversely with respect to the direction of extrusion; (3) which is easily separable into threads running parallel to the length of the material; and (4) having a very high resistance to breaking as a result of repeated flexing. "These objects and others ancillary thereto are obtained by adding two or more incompatible thermoplastic, fiber-forming linear-polymeric compositions [4] to an extruding machine and extruding the two materials to form a unitary product.

"At least two of the thermoplastic materials which are extruded must be fiber-forming material * * * and must be incompatible. Apparently any two of such fiber-forming thermo-plastic materials that are incompatible can be employed although it is obvious that the plasticizing temperatures of the two materials should not be too far apart. The proportions of the incompatible materials are not very critical, the proportion of

stretching the same whereby a unitary product consisting essentially of two distinct series of parallel threads adhered together is obtained.

"2. A process of producing strip material which has a homogeneous appearance but separates into a plurality of substantially parallel filaments when sharply bent comprising the steps of mixing cellulose acetate with cellulose acetate butyrate which is non-compatible with said cellulose acetate, plasticizing the mix, and forcing the mix containing two separate solid phases through a die, one phase of said mix comprising a solid fiber-forming material consisting essentially of cellulose acetate and the other phase comprising a solid fiber forming material consisting essentially of cellulose acetate butyrate.

"4. As an article of manufacture, an extruded longitudinal strip of thermoplastic material, having a homogeneous appearance but actually comprising two chemically distinct solid phases, each of said phases consisting essentially of a fibrillar, linear-polymeric, thermoplastic material which has a similar melting point but which is incompatible with the thermoplastic material of the other phase even when melted, the linear alignment of the individual fibers of each of said thermoplastic materials being substantially parallel and said strip having a substantial thickness whereby when the strip is bent sharply at any point the phases separate into a plurality of layers each containing a multiplicity of filaments, said product being substantially unseparable transversely thereof beyond the filamentary stage by any operation involving only the repeated bending of the strip.

"5. As an article of manufacture, an extruded longitudinal strip of thermoplastic material, having a homogeneous

appearance but actually comprising two chemically distinct solid phases, each of said phases consisting essentially of a fibrillar, linear-polymeric, thermoplastic material which has a similar melting point but which is incompatible with the thermoplastic material of the other phase even when melted, the linear alignment of the individual fibers of each of said thermoplastic materials being substantially parallel to the length of the strip and said strip having a substantial thickness whereby when the strip is bent sharply at any point the phases separate into a plurality of layers each containing a multiplicity of filaments, said product being substantially unseparable transversely thereof beyond the filamentary stage by any operation involving only the repeated bending of the strip.

"7. As an article of manufacture, an extruded longitudinal strip of thermoplastic material, having a homogeneous appearance but actually comprising two solid phases, one of said phases consisting essentially of cellulose acetate, the other of said phases consisting essentially of cellulose acetate butyrate, said two cellulose derivatives of the two phases being incompatible with each other and each having a fibrillar structure, the linear alignment of the individual fibrils of each of said cellulose derivatives being parallel and said strip having a substantial thickness whereby when the strip is bent sharply at any point the phases separate into a plurality of layers each containing a multiplicity of filaments said product being substantially unseparable transversely thereof by any operation involving only the repeated bending of the strip."

4. The example set forth in the patent and Claims 2 and 7 disclose the use of cellulose acetate and cellulose acetate butyrate.

either one can vary from about 5% to 95% or more, of the mixture. The best mixture so far found is 40–60% of cellulose acetate with 60–40% of cellulose acetate butyrate." Col. 1 line 44.

As set forth in the patent, the process is that a mix comprising two incompatible thread-forming plastic materials is extruded through a die to form a strip, which can be separated longitudinally into a plurality of threads or filaments. Is such a process patentable as a new and useful process, or composition of matter or improvement thereof?[5] Does the patent show " 'more ingenuity * * * than the work of a mechanic skilled in the art.' [Citing cases.]" Sinclair & Carroll Co. v. Interchemical Corp., 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644, cited in Modern Art Printing Co. v. Skeels, 3 Cir., 1955, 223 F.2d 719. Has there been "* * * an innovation for which society is truly indebted to the efforts of the patentee. * * *" Sinclair & Carroll Co. v. Interchemical Corp., supra, 325 U.S. 330, 65 S.Ct. 1145.

Defendants argue that when Seckel mixed cellulose acetate and cellulose acetate butyrate[6] and extruded it to produce a longitudinally fibrous product his process and product resulted from knowledge obvious to a person having ordinary skill in the art.[7]

Any extrusion of cellulose acetate by itself or of celluose acetate butyrate by itself always results in a product which is devoid of internal fibers; never, when extruded alone, is the mono-filar filament (non-fibrous) of cellulose acetate or of cellulose acetate butyrate inherently or internally fibrous. The patent discloses that when a mixture of cellulose acetate molding powder and cellulose acetate butyrate molding powder is plasticized[8] and extruded through a single die orifice, the extruded strip automatically and inherently is internally fibrous. From these facts, plaintiffs conclude that the internal fibrous character of the extruded mixture is an amazingly unexpected result arising from the concomitant extrusion of the plasticized mixture of two incompatible thermoplastics. Plaintiffs ask this court to hold that Seckel's discovery of a new composition of matter of unique, unexpected, desirable properties —an internally fibrous strip—produced by mixing, plasticizing, and extruding cellulose acetate and cellulose acetate butyrate is patentable.

The steps in the patented process are: (a) Mixing two incompatible thermoplastic fiber-forming linear-polymeric compositions; (b) plasticizing the mixture in an extruding machine; and (c) extruding the mixture through a die, the result of which is a longitudinally fibrous strip. Steps (b) and (c) alone and combined are not patentable under the familiar standards set forth in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; this court's views concerning patentability are set forth in Joseph Bancroft & Sons Co. v. Brewster Finishing Co., D.C.N.J.1953, 113 F.Supp. 714, affirmed 3 Cir., 1954, 210 F.2d 677, and Avery v. Ever Ready Label Corp., D.C. N.J.1952, 104 F.Supp. 913.

Is the mixing described in (a) alone or combined with (b) and (c) to produce the strip sufficient to sustain the patent? The Goessling Patent No. 2,353,457, issued July 11, 1944, for "Synthetic Pearl Resin" discloses the principle of mixing two incompatible thermoplastic resins to produce a resin having an appearance similar to pearl; the pearl effect is achieved by mixing the molding powders of two clear plastics or of one clear plas-

---

5. 35 U.S.C.A. § 101.

6. Commercially, they are known as Tenite I and Tenite II. Tenite I is a cellulose acetate molding composition sold by the Tennessee Eastman Company since 1934. Tenite II is a cellulose acetate butyrate

molding composition sold by the Tennessee Eastman Company since 1938.

7. 35 U.S.C.A. § 103.

8. I. e., heated until melted.

tic and one translucent plastic and heating them in an injection molding machine to produce a molded article. The Jacqué Patent No. 2,185,789, issued January 2, 1940, for "Thread and Fiber of Organic Thermoplastic Materials and Process of Producing the Same" discloses a process of producing threads from highly polymerized organic materials by forming a thin film of the material and stretching it in the direction of its length. The Malm Patent No. 2,223,376, issued December 3, 1940, for "Yarn" teaches that a fiber can be made from cellulose acetate butyrate. The Dreyfus Patent No. 2,050,286, issued August 11, 1936, for "Method of Making Synthetic Straw" teaches the use of cellulose acetate and cellulose acetate butyrate under heat and pressure to obtain a plurality of fibers. Such disclosures, especially Goessling's, that two incompatible polymeric materials could be mixed and injection molded to produce a unitary structure with the materials retaining their separate phases anticipated Seckel's mixture and result. Additionally, a publication entitled Plastics Technology, "Stretch Orientation of Polystyrene and Its Interesting Results," written by James Bailey, and contained on pages 225–231 of the May 1934 issue of India Rubber World, discloses that in a fiber-forming polymer which is extruded, the molecules will be aligned in a longitudinal direction.

Based upon such disclosures and aided by the expert testimony interpreting the prior art, the court concludes that it would have been obvious to a person having ordinary skill in the art that cellulose acetate and cellulose acetate butyrate were a fiber-forming polymer, which when extruded individually through a small orifice would form a longitudinal fiber; and it would have been obvious to such a person that the two materials were incompatible so that if they were mixed and extruded they would retain their separate natures even though coalescing into a unit

During the trial, the plaintiffs introduced considerable evidence that the patented product can be sewn through, which apparently they believed was a feature tending to prove patentability. Plaintiffs, however, in their lengthy brief and proposed findings of fact and conclusions of law do not discuss that feature of their product. Moreover, in their brief they admit that feather boning, which preceded their product, can be sewn through. Although, "A patent will protect its holder in his monopoly over whatever use it is capable", Floridin Co. v. Attapulgus Clay Co., 3 Cir., 1942, 125 F.2d 669, 670, 671, the court notes that nowhere in the patent is there a disclosure of the sewing feature.

Plaintiffs' brief refers to the patent in suit in glowing terms, such as, "unexpected and outstanding discovery"; "a synergistic effect if there ever was one"; "unexpected result * * * contrary to the teachings and experience of the plastics industry"; "a giant and radically different stride in the plastics art"; "the discovery of Seckel that the eleven year dogma of the entire plastics art had been wrong"; "in one stroke of experiment buried forever the eleven year misconception and ignorance of an entire industry"; "the hallmark of the greatest of inventions"; "a classic case of the discovery of a new composition"; "unexpected result in the light of these prior contrary teachings and beliefs"; "pushed back the borders of darkness and advanced the frontiers of science"; "taught the art to follow him on a path in a direction 100% opposite to that chartered by the leading scientists of the industry"; and even suggesting an analogy between the Seckel invention and that of Charles Goodyear for vulcanizing rubber. These "findings" are interesting and if true might call for a finding of validity, but unfortunately they are not supported by evidence. Language such as this suggests a need for more semantic discipline.

Plaintiffs' brief further suggests that Section 103 of the 1952 Patent Code was intended to reduce or lower the standard of invention as set out in the

decisions of our Supreme Court and other federal courts during the past twenty-five years. It is true that Judge Learned Hand's opinion in Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, sets forth by way of dictum that such was the intention of Congress. However, the Court of Appeals for the Third Circuit in 1953 said in Stanley Works v. Rockwell Manufacturing Co., 203 F.2d 846, 849:

> "On its face Section 103 is merely a codification of decisional patent law. The report of the Senate Committee on the Judiciary (Vol. 38, No. 8, Journal of the Patent Office Society of August 1952) leaves no doubt about this. In part that report states:
>
> "'Section 103, for the first time in our statute, provides a condition which exists in the law and has existed for more than 100 years, but only by reason of decisions of the court. An invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent. That has been expressed in a large variety of ways in decisions of the courts and in writings. Section 103 states this requirement in the title. * * *'"

In applying the high standards of patentable invention set by our Supreme Court, our task is to draw the line between a small step forward and a giant stride. This process and product are useful, but certainly there has been no giant stride. I conclude, therefore, the patent claims involved here invalid for lack of invention.

As to defendants' request for attorneys' fees, 35 U.S.C.A. § 285 provides that "The court in exceptional cases may award reasonable attorney fees to the prevailing party." The allowance of attorneys' fees is discretionary. Randolph Laboratories v. Specialities Development Corp., 3 Cir., 1954, 213 F.2d 873, certiorari denied sub nom. Specialties Development Corp. v. Randolph Laboratories, Inc., 1954; Jacquard Knitting Machine Co., Inc., v. Ordnance Gauge Co., Inc., 3 Cir., 1954, 213 F.2d 503. The court does not find plaintiffs guilty of any bad faith, nor is there any other " * * * equitable consideration of similar force which would make it greatly unjust for defendant[s] to take care of its [their] own counsel fees * * *." Jacquard Knitting Machine Co., Inc., v. Ordnance Gauge Co., Inc., 3 Cir., 1954, 213 F.2d 503, 509.

The foregoing opinion shall constitute findings of fact and conclusions of law, as required by Rule 52, Fed.Rules Civ. Proc. 28 U.S.C.A.

An order may be submitted in conformity with the opinion herein expressed.