**OLD COLONY ENVELOPE COMPANY, Inc., and Stein, Hall & Company, Inc.**

v.

**Setrak K. BOYAJIAN, individually and doing business as Precision Testing Laboratories.**

**Civ. A. No. 57-1246.**

United States District Court
D. Massachusetts.

Sept. 16, 1959.

Brumbaugh, Free, Graves & Donohue, Eben M. Graves, New York City, Ropes, Gray, Best, Coolidge & Best, James P. Lynch, Jr., Boston, Mass., for plaintiff.

Setrak K. Boyajian, in pro. per.

WYZANSKI, District Judge.

1. Plaintiffs' motion prays for a summary judgment (1) declaring that all the claims of U. S. Pat. No. 2,804,395, owned by defendant, are invalid and not infringed by products made and sold by plaintiff Stein, Hall & Company, Inc. and plaintiff Old Colony Envelope Company, Inc., and (2) dismissing defendant's counterclaim.

2. Supporting and opposing affidavits and other documents have been filed in generous quantities. Defendant seeks to raise many issues of fact with respect to validity, infringement, and damages. But it seems to this Court that there are some simple, undisputed facts which, as a matter of both fact and law, require this Court, obedient to 35 U.S.C. § 103 and cases such as Sinclair & Carroll Co. Inc. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644, to rule that there is no patentable invention. Even if everything set forth as a fact in defendant's voluminous proffers be true, there is in these proffers nothing that contradicts or qualifies the basic facts set forth in the following paragraphs.

3. The patent in suit, issued to defendant on August 27, 1957 on application filed September 4, 1953, relates to

envelopes and like papers with remoistenable adhesive comprising polyvinyl alcohol.

4. Polyvinyl alcohols are a species of vinyl type synthetic resin polymer chemicals. They are manufactured from polyvinyl acetates. Conversion from an acetate to an alcohol is by hydrolysis or saponification. This involves the replacement of some or all of the acetate groups by hydroxyl groups. By varying the degree of polymerization of the vinyl acetate and the degree of the hydrolysis of the acetate, a person can produce different types of polyvinyl alcohols.

5. May 9, 1944 there was issued to Kline U. S. Patent No. 2,348,220 based on Kline's invention of paper products, including envelope flaps, having on one side a remoistenable adhesive film comprising a partially hydrolyzed grade of a water-soluble polyvinyl alcohol.

6. By 1947 E. I. Du Pont de Nemours & Co. made and sold under the trademark "Elvanol" ten types of polyvinyl alcohol, including types 51–05 and 52–22. In the 1947 "Elvanol" brochure, there are descriptions of the uses of the various types. The brochure pointed out that types 51–05 and 52–22 (in which 86–89% acetate groups of the polyvinyl acetate had been replaced with hydroxyl groups, and which are called "partially hydrolyzed" types,) were water-sensitive enough to be used as remoistenable adhesives.

7. Du Pont sold these polyvinyl alcohols as a dry, white powder. Consequently, those who wanted to apply a polyvinyl alcohol as a liquid adhesive composition first had to dissolve the powder in water. The 1947 brochure gave these directions as to the method to be followed: .

"Although the * * * 36–89% hydrolyzed grades are soluble in cold as well as hot water, solution takes place more rapidly on heating. Therefore, dispersing in cold water, then heating, * * * is suggested. An optional method is to have the temperature of the water about 90°C. (194°F.) when adding the 'Elvanol' " * * *

8. The brochure recognized that:

"Water solutions of Elvanol have been heated at 100°C. (212°F.) for several days without any apparent change except for a drop in pH in the case of partially hydrolyzed grades."

9. Through Du Pont's brochure, many persons before Boyajian used partially hydrolyzed polyvinyl alcohols as remoistenable adhesives for paper products.

10. Boyajian's patent recognizes this wide usage. But it asserts that—

"polyvinyl alcohol * * * is not a sufficiently pure product in its raw state so that it may be employed as an envelope seal gum: for * * even extremely small quantities of contaminant will have a very decisive influence upon the permanence of the remoistenability of such adhesives".

11. We may *for present purposes* assume that Boyajian was correct in asserting that polyvinyl alcohol was so impure and unstable a product that it did not work satisfactorily when subjected to ordinary solutions in water. (However, there is evidence that Boyajian was mistaken and that fully satisfactory adhesives have for many years been achieved by ordinary solutions in water of polyvinyl alcohol.)

12. Boyajian believed he could obtain the stable properties required for an envelope seal gum by "chemically" and "physically" modifying the polyvinyl alcohol. He proposed selecting cane sugar as the chemical modifier and boiling, in aqueous solution, as the physical modifier. His patent says:

"I found that while some samples of polyvinyl alcohol in 22.5% initial aqueous solution would if heated to 100 degrees C jell on cooling, when such solution is brought to actual boiling and kept there for one hour or more, under agitation so as to distill off all of its volatile contami-

nants, and precipitate all of its solid contaminants, while also breaking up the nesting or clustering of molecules or particles, a near clear, free-flowing, and viscous solution will, after setting out and cooling, result."

13. It is further said in the patent that—

" * * * boiling will give to polyvinyl alcohol a lustrous, structurally stabilized, integrated, quicker-adherent upon remoistening, non-jelling and free-flowing while in solution, more resistant to humidity, more responsive to applied moisture, smoother, clearer, and more flexible film-forming, and quicker-drying character" * * *

"When the desired structural simplicity, integrity, and workability of the polyvinyl alcohol solution is obtained by the boiling alone, then cane sugar may be omitted."

14. The patent sets forth 10 claims. Claims 2, 3, 4, 6, 7, 8, and 9 may be first considered. Each of these claims makes it evident that Boyajian regards as his invention an envelope or like paper depending for its adhesive on a polyvinyl alcohol which has been boiled in aqueous solution for a period of one hour or more in order to distill off any volatile contaminants and precipitate any solid contaminants.

15. Claim 4 which is fairly illustrative reads as follows:

"4. An envelope having on the underside of the marginal portions of the seal flap thereof a glossy layer of remoistenable adhesive coating composition having as its essential ingredient polyvinyl alcohol which has been boiled in aqueous solution by dissolving in hot water in a suitable jacketed kettle having a mixer and bringing the temperature to boiling and keeping it there under agitation for approximately one hour or until all the lumps have disappeared and a near-clear homogeneous solution has been formed, with all volatile contaminants distilled off therefrom."

16. The only possible basis for contending that claim 4 shows an advance over the prior art is to rely upon the boiling of the polyvinyl alcohol, and the connected process of keeping the boiling mixture under agitation. It could not be successfully asserted that there was any disclosure of new properties or uses of polyvinyl alcohol, for there was widespread familiarity with the use of polyvinyl alcohol in liquid adhesives. Moreover, it was known that Du Pont had recommended that if the polyvinyl alcohol in powder form was put in solution the best results were achieved when the solution has heated to 194°F. And it was also known that Du Pont had stated that the solution could be safely boiled. Now, it may be assumed, Du Pont to the contrary notwithstanding, that at the 212°F temperature of boiling the result is more satisfactory, and that boiling for an hour in a kettle in which the solution is agitated does produce a more satisfactory product. But even if this assumption be made, the improvement made by Boyajian is, as a matter of ultimate fact and of law, not the kind of improvement which will support a patent. It is an advance which would have been obvious to a man skilled in the art and which was pointed out by Du Pont as a workable variation from the practice it recommended. It is not a patentable invention within the statutory requirements of 35 U.S.C. § 103. See Sinclair & Carroll Co. Inc. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644. And this conclusion of invalidity could not be overcome even if defendant could prove every fact set forth in his affidavits and the other material submitted by him.

17. The conclusion of invalidity with respect to claim 4 requires a similar conclusion of invalidity with respect to claims 2, 3, 6, 7, 8, and 9.

18. Claim 1 is invalid because it does no more than use a series of laudatory adjectives. The claim does not describe the structure or composition of

Boyajian's adhesive composition. It does not even refer to boiling the solution. It does not point out and distinctly claim the alleged invention. The claim thus fails to meet the standard of 35 U.S.C. § 112.

19. Claims 5 and 10 refer to the addition of cane sugar "at the conclusion of boiling." There was nothing new about the use of cane sugar to make an adhesive more flexible and slower drying. The use made of sugar by Boyajian was not such advance over the prior art as would not occur to a person skilled in the art. Therefore claims 5 and 10 do not constitute patentable invention, and are invalid for want of invention.

The motion for summary judgment is granted on the ground that all claims of U. S. Patent No. 2,804,395 are adjudged invalid for want of invention and claim 1 is adjudged invalid on the further ground of failure to comply with 35 U.S.C. § 112.