**POLYMER PROCESSES, INC., Plaintiff,**

**v.**

**CADILLAC PLASTIC AND CHEMICAL CO., Inc., Defendant.**

**Civ. A. No. 19874.**

United States District Court
E. D. Michigan, S. D.
July 18, 1963.

Synnestvedt & Lechner, Philadelphia, Pa., and Charles Rutherford, of Whittemore, Hulbert & Belknap, Detroit, Mich., for plaintiff.

Cullen & Cantor, Detroit, Mich., and Charles J. Merriam, Chicago, Ill., for defendant.

TALBOT SMITH, District Judge.

This is a statutory action for patent infringement. The plaintiff herein, Polymer Processes, Inc., is a Pennsylvania corporation. It has a regular place of

business in Reading, Pennsylvania. Defendant, Cadillac Plastic and Chemical Company, Inc., at the time this action was instituted was a Michigan corporation having a place of business in Highland Park, in the Eastern District of Michigan.[1] The Court has jurisdiction of the parties and of the subject matter.

It is the claim of the plaintiff, the owner of the patents in suit, that defendant has infringed claims 1, 2 and 3 of its U.S. Patent No. 2,719,330 (hereinafter sometimes referred to as the Stott patent) and claims 9, 10, 14 and 15 of its U.S. Patent No. 2,747,224 (hereinafter sometimes referred to as the Koch patent). It is stipulated that judgment on claim 1 of the Stott patent will be determined by judgment on claim 2 of said patent and need not be separately litigated or considered.

This patent litigation involves the material which the layman calls "plastics." Plastics are divided by those working in the field into two general classes, namely, thermosetting resins and thermoplastic resins. Thermosetting resins are chemical materials which undergo an irreversible chemical change when they are heated and molded, so that they cannot afterwards be reformed. Thermoplastic resins become reversibly plastic when heated, and therefore can be heated, shaped and cooled a large number of times. This latter classification includes the nylons (all of which are, chemically, synthetic linear polyamides) since they do not undergo an irreversible hardening reaction, but can be heated, reshaped, and cooled many times. Nylon has a mold shrinkage somewhat less than that of common metals and its coefficient of thermal expansion is in the middle of the range for plastics.

Some, but not all, nylons have sharp melting points. (It was testified that Nylon 6, used by defendant, has a melt temperature of approximately 210 degrees centigrade.) That is, such nylons do not soften as they approach their melting points but suddenly change from a hard substance to a fluid. Upon freezing the reverse is true. This is a characteristic common to metals. Nylon, at a temperature near its melting point, has a great adhesion to metal. (We will advert later to the "stalling" or jamming of nylon rods in the tube in which they are formed). Molten nylon also requires a pressure of at least 150 pounds per square inch to prevent the formation of bubbles within it due to the evolution of gases which form naturally under these conditions unless the pressure is maintained.

Of the several kinds of nylon, defendant uses, as raw material in its process, a nylon known as polymerized epsilon amino caproic acid, or polymerized caprolactam, or type 6 nylon. This may be referred to broadly as a "high melting polyamide". Defendant's commercial operations, so far as is here pertinent, have to do with the formation of thermoplastic rods, particularly of nylon rod, and the patents in suit have to do with the formation of such rods.

To those to whom the word "nylon" is equivalent to articles of clothing of a relatively fragile nature, it will come as a surprise to learn that, actually, nylon has found widespread usage in industry since World War II, when it became generally available to the public, for such articles as gears and bearings. Thus it has been used as a stop-valve seat in Navy torpedoes (replacing a metal valve seat), for which usage it had to withstand an air pressure of 2800 lbs. per square inch. It has a very considerable resistance to wear, it is tough, and it is light in weight.

An industrial demand has developed for nylon in the form of rods from which parts can be machined or cut. The plaintiff herein had commenced the manufac-

---

1. It is stipulated that subsequent to the commencement of this action, defendant was merged into Dayco Corp., a corporation of the State of Ohio, that said Dayco Corporation has succeeded to all of the assets, liabilities, and obligations of defendant Cadillac Plastic and Chemical Company, Inc., that it is subject to the jurisdiction of this Court, and that it will be bound by any judgment entered herein.

-ture of nylon rods after the war by the use of the "batch type" process. In this process hot fluid nylon is injected under high pressure into a closed mold. Since nylon shrinks substantially upon cooling and freezing, resulting in bubbles or voids, it was necessary to force molten nylon under pressure into the core of the rod, until the rod could completely solidify. The pressure thus applied to the melt "accommodate[s]" [2A] the loss of volume in the center. Plaintiff obtained patents on its batch method of forming nylon. Such patents, we note, are not here in dispute. They are described as part of the background of the art. We are here concerned with patents relating to the "extrusion" of nylon, much as *toothpaste* is "extruded" from a tube. The nylon, however, is extruded in the solid form of rods rather than, as toothpaste, a soft material.

It is Stott's claim (see claim 2 in suit [2]) that he accomplishes such extrusion in the following manner: He first melts the nylon, obtaining a hot liquid. Then, (continuing in the language of the claim itself, broken down into paragraphs for greater ease in following the successive steps):

"filling the entrance end of an elongated tube having an open discharge end with the liquid polyamide by feeding the liquid polyamide into said entrance end of the tube, said tube having a bore of cross section larger than said predetermined cross section,

"advancing the liquid polyamide in the tube in contact with the interior thereof,

"cooling the polyamide while it is advancing in the tube in contact with the tube interior by effecting heat transfer radially outwardly through the tube wall to progressively solidify the polyamide radially inwardly as the shape being formed is advanced through the tube and thereby form a solidified annulus surrounding a core of liquid polyamide in an initial region of cooling,

"expanding said solidified annulus against the tube wall by feeding additional liquid polyamide into said core under pressure sufficient to overcome the tendency of said annulus to shrink away from the tube interior during solidification and thereby to develop frictional resistance against advancement of the shape being formed,

"continuing the pressure feed of the liquid polyamide to advance the shape being formed against said frictional resistance through said initial region of cooling and therebeyond,

"and continuing the cooling beyond said initial region, whereby said annulus thickens and shrinks away from contact with the tube interior to provide a solidified shape of said predetermined cross section."

In less technical language, what we have here is a method for forming a nylon rod (for example) by feeding hot liquid nylon into one end of an open ended tube, flowing the nylon through the tube and cooling it, as it flows, through its contact with the tube. As it solidifies a solid skin is formed, surrounding a core of still-liquid nylon. More hot liquid is forced into the core to expand the skin against the tube, from which it tends to shrink as it cools. The skin contacting the tube frictionally resists the movement of the now-forming rod through the tube, but the method claimed comprises "continuing the pressure feed" of the liquid nylon to advance the rod through the tube despite the frictional resistance, and "continuing the cooling" of the rod, so that the skin thickens and shrinks out of contact with the tube to form a solid rod which emerges from the other end.

2A. Tr. 72.

2. Claim 3 of Stott patent adds to the description of Claim 2 the statement that the feed of liquid polyamide is effected under a pressure of at least 200 lbs. per square inch.

It is the essence of the process described above that it is a *continuous* process. Molten nylon is fed continuously into the forming tube. It thereby continuously pushes the solidifying rod out. This is not to say that the rod may not, at times, stick or stall[3] or jam in the tube but such is not a part of the claimed process. The outstanding characteristic of the process is continuing flow: the feed in, the rod out.

Defendant also obtains a solidified rod as the end-product of its process, but it goes at the problem differently. It employs a process operating in cycles. Molten nylon is forced from an extruder, which operates continuously, into a chilled forming tube where the nylon solidifies. Defendant's apparatus includes a manifold which generally is used to feed molten nylon into two or more forming tubes at the same time. A control or interrupter valve is located in the path of the molten nylon between the manifold and each forming tube. This valve interrupts the feed during each cycle. Thus we have a stop-and-go, on-and-off operation. During one part of the cycle, the valve passes a batch or slug of molten nylon into the forming tube. This molten batch begins to solidify, being aided in this process by a thermal insulating ring just before the forming tube, and forms a skin which adheres to the wall of the forming tube. As freezing continues and the solid annulus thickens, it shrinks away from the wall of the tube. It is necessary to point out here that the defendant, unlike Stott, employs rollers as a part of its operation. These rollers, at this stage of the operation, are gripping and pulling upon the solid rod. This pull, added to the shrinking effect, according to the testimony of one of defendant's experts, "breaks the outer surface of the rod free of the forming tube," and the rod lurches ahead, for a short distance,

with a pronounced jerk. The control valve now opens and more liquid nylon is admitted, whereupon the same operation repeats itself.

It is pertinent here to highlight certain differentiations between plaintiff's operation and that of defendant, as bearing upon the charges made and the defenses thereto. First, the presence in defendant's operation of an interrupter valve. The flow of molten nylon is thus off-and-on, on-and-off, not continuous. Moreover, the employment of this interrupter valve has a direct relation to the fluctuations in pressure of the molten nylon being fed into defendant's forming tube. The pressure varies considerably during each cycle. Secondly, it has been pointed out that the defendant employs rollers as a part of its operation. The significance of these differentiations will be discussed infra. Suffice for present purposes to note at this point their existence.

The teachings of Stott seem clearly to rely upon a balancing of forces: An annulus, or skin, is formed and expanded. It travels forward along the tube wall in continuous motion, the backward pressure of adhesion, that is, the resistance caused by the adhesion of the solid nylon to the metal inner wall of the forming tube, being balanced against the forward force due to the static pressure of the molten nylon. But defendant does not so rely. Its forces are not balanced, but designedly and intentionally brought out of balance. At one stage of the cycle the molten nylon presses the solidified portion against the tube wall with such force that the rod does not move along even though it is being acted upon by very substantial forces, including the fixed rollers above mentioned. Yet, when the valve is closed, the rod cools and shrinks, frees itself from the wall, and, being under pressure of the liquid nylon trapped behind it, spurts forward a short

---

3. The Stott process does not contemplate a stalling of the rod as a planned and desirable step therein. What Stott actually says thereon clearly indicates that if stalling occurs the process is not operating in the desired manner: "Excessive increase in this frictional resistance will tend to stall the operation and it is therefore preferred to employ relatively high cooling rates." Column 3, Stott patent, lines 60–63.

distance, being limited by the slack in the gear-train on the drive rolls. At this point in the cycle the rollers are acting as a brake. At the first described stage, the resistance due to adhesion is greater than all forces tending to expel the rod out of the tube. But, at the second stage, if the tension of the rollers were released, or if there were no rollers, the rod would be propelled out of the tube. The rollers described are essential to the operation of the defendant's process. In the described operation, then, not only does the pressure of the molten nylon fed into the tube vary within each cycle, but the movement of the solidified rod out of defendant's forming tube also varies during each cycle, with movement at its maximum during the time the molten nylon feed is interrupted and at its minimum during the time the feed is not interrupted.

The process described in the Stott patent in suit, in contrast, is, as we have observed, a continuous process. Molten nylon from the extruder is continuously, i. e., without interruption, fed into the end of a chilled forming tube, where the nylon solidifies by freezing. It is the essence of Stott's process to continuously feed molten nylon into the forming tube to thereby continuously push the solidifying rod out of the forming tube, not to stop-and-go, or to stall and start. The Court concludes that claim 2 of the Stott patent, the principal claim in suit, is not infringed by defendant's accused process because the Stott claim specifies that the feed is continued to advance the

rod, whereas defendant does not continuously feed molten nylon into the forming tube to continuously push out the solidifying rod, but rather uses an interrupted, or intermittent feed. In fact, during the time that the rod is advanced in defendant's process, in the manner described hereinabove, the feed is stopped.

The difference between defendant's process and Stott's process may be likened roughly to the difference between defendant's splitting a log by repeated axe-blows on a wedge, and Stott's splitting the same log by continuous, unremitting hydraulic pressure on the wedge. There is a difference in theory and a difference in practice.

Koch aimed to improve upon the Stott process by making it less erratic. His patent states in substance that in the "general type of operation" above described (i. e., feeding molten plastic from an extruder into one end of a cold forming tube in which the plastic solidifies), "the pressure of feed of the softened material tends to vary," with the result that the plastic material moves through the forming device "more or less erratically." In order to so improve he added to the Stott process certain techniques, namely, the techniques of establishing and maintaining substantially uniform the feed pressure of the molten nylon entering the cold tube and also establishing and maintaining substantially uniform the rate of delivery of the solidified rod leaving the tube.[4] The first step, that having to do with the establishment and maintenance of a substantially uniform pressure of

4. Claims 9, 10, 14 and 15, Patent 2,747,224, R. B. Koch, et al: "9. A method for continuously forming elongated shapes from softened thermoplastic material, comprising continuously feeding a stream of softened material under pressure into the inlet end of a forming device having open inlet and discharge ends, cooling the material to the point of solidification during passage thereof through the forming device in contact with the interior of said forming device, establishing and maintaining a substantially uniform rate of delivery of the solidified shape from the discharge end of said forming device, and establishing and maintaining a sub-

stantially uniform pressure of the softened material in the inlet end of the forming device."

"10. In the formation of elongated shapes from polyamides of the kind which are liquid in the molten condition by the method of feeding liquid polyamide into the inlet end of a forming tube having open inlet and discharge ends and cooling the polyamide to the solidification point during its passage through the forming tube, in which method variations in rate of delivery of the solidified shape from the forming tube and variations in pressure of the liquid polyamide in the inlet end of the forming tube tend to oc-

the liquid nylon in the entrance end of the forming tube, is illustrated in the drawings of the patent in connection with the use of a control system which varies the feed of liquid nylon into the end of the forming tube in response to changes of pressure in the forming tube in a sense to restore the pressure in the forming tube to a desired value. The step of establishing and maintaining a substantially uniform rate of delivery of the solidified rod is illustrated in the patent as being performed by constant speed exit rolls engaging the rod beyond the exit end of the forming tube.

Defendant's process and machinery, however, depart from the concept and practice of substantial uniformity, either of feed pressure or rate of delivery, and thus are entirely distinct from those of the patents in suit. Specifically, defendant's process does not use steady continuous feed, but rather uses constantly varying feeds. Defendant's process feeds most rapidly at time of least pressure in the die chamber.

Defendant's process, moreover, does not maintain a steady pressure. The pressure starts at a minimum when the interrupter valve begins passing the molten nylon and rises to a maximum at the point where the valve is actuated to interrupt the feed. This rise in pressure operates the valve and causes it to interrupt the feed. There is no necessary relationship between the pressure in the manifold and the pressure in a forming tube. The pressure varies as much as 100% from its base point periodically every few seconds. This, obviously is neither a uniform nor a substantially

uniform pressure. The plaintiff has devoted considerable space to a differentiation between the words "uniform" and "substantially uniform", e. g., between "uniform pressure" and "substantially uniform pressure." That a distinction may be made between them is obvious. Whether significant for our issues or not is another matter, for the words in a patent, just as the words in any other document, must be construed in the light of their context. The patents in suit contemplate a process in which a steady state of operation is achieved, with ideally a constant and uniform flow of liquid nylon into the forming tube and a uniform emergence of rod out of the tube. Defendant's process, on the other hand intentionally and deliberately employs an interrupter valve which causes wide variations in pressure to occur periodically. (This is what we have previously described as a cyclical, stop-and-go operation, as opposed to plaintiff's attempted non-varying pressure and flow conditions.) There is thus a marked difference between the operation of the two processes, and it is this difference that controls our decision, not arguable semantic differences in the claims. It is clear that in defendant's process, the pressure in the forming tube varies, over a period of a few seconds, well over one hundred per cent from its base point. This is neither a "uniform" nor a "substantially uniform" pressure.

Defendant purposely includes, as has been noted, a thermal insulating ring (called a "sindanyo" ring) between the die head and the forming tube so that the nylon is shock cooled as it enters the forming tube to produce a thick annulus.

---

cur; the steps of forceably establishing and maintaining a substantially uniform rate of delivery of the solidified shape out of the discharge end of the forming tube and establishing and maintaining a substantially uniform pressure of the liquid polyamide in the entrance end of the forming tube by controlling the feed of liquid polyamide into the inlet end of the forming tube."

\* \* \*

"14. The method of claim 10 in which the forcible establishment and mainte-

nance of said substantially uniform rate of delivery is effected by gripping the solidified shape beyond the discharge end of the forming tube between opposed friction gripping surfaces at least one of which is moveable in the direction of the solidified shape and is driven at a uniform rate."

'15. The method of claim 14 in which the rate of drive of the driven gripping surface is such as to tend to retard delivery of the solidified shape."

of nylon which cannot be pressed against the tube over a large area. There is, of course, adhesion at this point but defendant's process does not even seek to balance adhesion of the rod to the tube against the propulsive force of the pressure of the nylon. Instead, it continually changes from an over-balance of these forces to an under-balance, so that its rod advances in short increment by jerks, or spasmodic motion. A delivery rate which varies from zero to a maximum value and back to zero periodically every few seconds is neither a uniform nor a substantially uniform rate.

■ The Court's conclusion is that claims 9 and 10 of the Koch patent (and claims 14 and 15 are necessarily covered by the same holding) are not infringed by the accused process practiced by defendant. Koch claims as his invention both maintaining substantially uniform the pressure of the molten nylon entering the forming tube, and maintaining substantially uniform the rate of delivery of the solidified rod leaving the forming tube. Defendant clearly does not include either of these two steps in its accused process. The essence of defendant's process is lack of uniformity, combining wide and sweeping variations in feed and pressure with a discontinuous, jerking, rate of delivery.

So much for the alleged infringements. These holdings do not, however, dispose of the case. "There has been a tendency," observed the Supreme Court,[5] "among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of the validity of the patent. [Citing cases]. It has come to be recognized, however, that of the two questions, validity has the greater public importance, Cover v. Schwartz [2 Cir.], 133 F.2d 541, and the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent."

Accordingly, the matter of validity of each of the patents in suit will be explored.

We have noted heretofore something of the history of what is known as "nylon", and how it has, since World War II, found widespread usage for such purposes as gears and bearings, taking the place, for these purposes, of parts customarily made of metal. Mr. Stott, himself, the record discloses, had at one time been in the metal processing business.

It was well known (with respect to the prior art) that nylon and metals have in common certain physical and behavioral characteristics. We have pointed out heretofore that some, but not all, nylons have sharp melting points. That is to say, they do not soften as they approach their melting point but suddenly change from a hard to a fluid substance and do the same in reverse on freezing. This is a characteristic also common to metals. They do not, that is, go through a mushy, or putty-like, stage, but rather abruptly melt at a critical temperature. In addition, nylon has crystalline properties more nearly like those of metals than of most thermoplastics. Gordon's patent of 1943[6] discusses the common characteristics of nylon and such metals as aluminum, zinc and tin, referring to crystalline structure, sharp melting point, and thermal stability. He disclosed that nylon could be processed through the use of familiar metal working techniques, such as die casting, injection molding, and extrusion molding. The fact of the matter is that the molding properties, the physical characteristics, and the behavior characteristics of nylon which are important with respect to the molding of nylon are similar to those of metals, rather than to those of most synthetic thermoplastic resins. This fact was known to the art before plaintiff did any work on the continuous extrusion of nylon.

5. Sinclair & Carroll Co., Inc. v. Inter-chemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945).

6. W. E. Gordon, Molding of Polymeric Materials, Patent No. 2,309,729, Feb. 2, 1943.

Many of the techniques commonly used in the processing technology of metals were known to be applicable to nylon, and it was common practice with nylon makers to borrow metal working techniques in processing nylon, prior to the time that the Stott patent was filed. Stott himself taught the art that metal processing techniques were useful in processing nylon several years prior to the filing of his patent application. In an article entitled "Molded and Machined Nylon," published in the December 1946 issue of Product Engineering he wrote, in part:

"  *  *  *  nylon molding powders behave in many respects like a metal. Especially noteworthy is their relatively sharp melting points  *  *  *."

Mr. Stott further stated in the same article that the described properties of nylon made it feasible to subject it to molding, and machining processes, to drilling, threading and tapping, and other operations commonly performed upon the metals, and noted its uses in such fields as bearings, gears, valve seats and in electrical parts.

It is the Court's conclusion upon the record made that it was known before 1948 (the date plaintiff asserts that Mr. Stott first conceived of a continuous process) that nylon molding powders behaved in many respects like metals and hence that the formation of nylon into pre-determined shapes presented problems similar to those encountered in forming metal.

It was also known before 1948 that metal could be formed by continuously extruding molten metal under pressure into a cold forming tube, wherein it formed a thin annulus of solid metal by contact with the cold walls of the tube, and in which process this thin annulus was forced by the pressure of the metal against the wall to provide a back pressure, but it was further known and thought that the annulus would gradually thicken sufficiently to resist the pressure and draw away from the wall, forward movement of the formed metal rod being brought about, at least in part, by the pressure of the liquid. In such processes, molten metal under pressure was forced into the molten core to make up for shrinkage due to cooling and freezing and to prevent bubbles and voids from forming.[7]

The prior art patents issued to Brennan, No. 2,530,854 and to Trotz, No. 894,410,[8] each discloses a process identical to that claimed by the Stott patent in suit in claim 2 except that the material being processed is metal, whereas Stott's material is nylon. The conclusion is inescapable that except for the substitution of the material being processed, i. e. nylon substituted for metal, everything that Stott claims is old in the prior art. Prior to Stott's claimed invention, nylon was known to possess certain physical characteristics similar to those of metal and was known to lend itself to treatment by the same techniques and processes commonly used for treatment of metal, hence using the old process disclosed by the above prior art patents to process nylon, in place of metal, was obvious.

With respect to the prior art, plaintiff discusses at some length the relative hardnesses of what we will refer to as the Stott annulus as compared with the metal annuli of the prior art. It is urged that the Stott annulus is a strong and hard annulus, as contrasted with a "mushy metal annulus". No measurements, however, were tendered the Court as to the actual relative strengths of either, nor is it clear that it is possible to make such measurements inside the forming tube. Since we must, then, proceed upon theoretical considerations it seems pertinent to observe that in any process of cooling from a liquid to a solid state, any material will at some stage in the process, be relatively soft. The processes, then, cannot be distinguished in this respect.

7. See defendant's exhibit CCC; Trotz' patent, 894,410; Brennan's patents 2,371,-604 and 2,530,854.

8. These items are both referred to in the preceding footnote.

We note, moreover, that the Brennan '604 patent contemplates an extrusion pressure as high as fifteen hundred pounds per square inch, which would seem to indicate a metal annulus of substantial strength. Regardless, however, of the unmeasured differences between "soft" and "hard", it is clear that the prior art discloses processes in which molten metal is introduced continuously into a chilled forming tube. During passage through the tube the molten metal is cooled and solidified to form an annulus which thickens as the material passes through the tube, so that the rod becomes solid before it emerges from the exit end of the forming tube. The patents indicate that the pressure of the molten metal in contact with the solidified annulus presses the annulus against the forming tube. The prior art, then, discloses precisely the same procedure, carried out with metals, as the Stott patent. The suggestion, to one skilled in the art, that nylon (with its known metal-like characteristics) could be continuously extruded in the same manner, is obvious, and the suggestion does not depend upon whether the metal annuli are called soft or hard.

It is clear from the record that constancy of pressure had previously been desired in the extrusion of softened materials in conventional extrusion processes. This, of course, did not render it less desirable (or less obvious) to use constant pressure, as well, in an extrusion operation where pressure is a critical factor in achieving smooth operation. The Court concludes that in the continuous extrusion of nylon rod in any situation where the adhesion of the rod to the tube wall is produced by the pressure of the molten nylon, and that pressure is also the propulsive force for moving the rod through the forming tube, it is obvious that it is desirable to maintain a uniform pressure. Any wide variations in pressure tend to jam the rod or to expel it.

Prior to 1948 the metal industry knew how to continuously extrude molten metal under uniform pressure into a forming tube in which a uniform pressure was maintained, and to withdraw the solid rod formed in the tube with the assistance of rollers contacting the rod and driven at constant speed so as to maintain a uniform withdrawal rate.[9] The prior art patents issued to Wieland, British Patent No. 504,519 and Brennan, U.S. Patent No. 2,371,604 both disclose techniques identical to those claimed by claims 9 and 10 of the Koch patent in suit, namely, (a) maintaining uniform the pressure of the molten material being fed into the forming tube and (b) maintaining uniform the rate of withdrawal of the solidified rod emerging from the forming tube, in a continuous extrusion process. These prior art patents refer to metal as the material being treated. Koch refers to thermoplastic (claim 9) or nylon (claim 10) as the material being treated. However, the substitution of these materials (plastic or nylon) for metals was obvious, bearing in mind that metal treating techniques were commonly used in treating nylon, which was known to have metal-like physical characteristics.

From the above it is inescapable that not only was the process claimed by Stott old, but the techniques claimed by Koch equally so. Although the prior art patents had to do with metal, and not nylon, nevertheless the two substances had, as had been known for years, common physical and behavioral characteristics. Using the identical, old processes, to process nylon instead of metal, was obvious to those skilled in the art at the time the purported inventions were made, and was no more than the exercise of expected, routine mechanical skill and not patentable invention. As was well put in Pierce v. Muehleisen, (9th Cir. 1955), 226 F.2d 200, 204.

"We do no more than recite a well established rule of law when we say the application of an old process to

9. See defendant's exhibit CCC, the Phillips, No. 2,126,808, Brennan, No. 2,371,- 604, Hopkins, No. 2,380,109, and Wieland, British No. 504,519, patents.

analogous material of foreseeably similar character is not a sufficient contribution to the science to justify the award of a patent monopoly."

It follows that the claims of Stott patent No. 2,719,330 and claims 9, 10, 14 and 15 of the Koch patent No. 2,747,224 are invalid for lack of patentable invention.

In the view the Court has taken of the case it is unnecessary to pass upon other defenses asserted by defendant or its motion to strike portions of plaintiff's brief.

The foregoing opinion shall stand as the findings of fact and conclusions of law under the provisions of Fed.R.Civ.P. 52(a). There shall be a judgment for defendant dismissing the complaint with costs to be taken in defendant's favor.