Application of Alan L. LITMAN and Doris L. Litman.
Patent Appeal No. 8931.

United States Court of Customs and Patent Appeals.
July 12, 1973.

Patrick J. Walsh, Fairfield, Conn., attorney of record, for appellant.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; Henry W. Tarring, II, Falls Church, Va., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Judges, and ALMOND, Senior Judge.

RICH, Judge.

This appeal was taken from the decision of the Patent Office Board of Appeals affirming the rejection of claims 3–9 and 11–13, and dismissing the appeal as to claims 2 and 10, of application serial No. 714,016, filed March 18, 1968, entitled "Assailant Incapacitator."[1] Appellants have withdrawn their appeal as to claim 10. We affirm.

Appellants' brief asserts that the invention herein claimed is being sold under the trademark "Chemical Mace," a "weapon" which is non-lethal and consists of a tear gas composition "in a conventional pressurized aerosol container" by means of which a stream of the lachrymatory composition can be propelled toward the face of an "assailant" to be subdued. It is said that he (or it) will be incapacitated with profuse lachrymation and intense pain of the nose and face but that this is a temporary condition and no permanent damage will be done.

*The References*

The appealed rejection is on the ground of obviousness in view of the following references:

| Barker et al. (Barker) | 2,146,715 | Feb. 14, 1939 |
| Williams | 2,159,241 | May 23, 1939 |
| Efford | 2,621,014 | Dec. 9, 1952 |
| Riley | 2,964,165 | Dec. 13, 1960 |
| Webster et al. (Webster) | 3,342,672 | Sept. 19, 1967 |
| | | (Filed May 7, 1964) |

Freon, published by E. I. DuPont de Nemours & Co., Wilmington, Del., pp. 10–11.

Shepherd, Aerosols: Science and Technology, published by Interscience Publishers, Inc., New York, 1961, pp. 263, 278, 281.

---

These references may be broadly divided into two categories. Barker and Williams are cited for their disclosures of known irritant substances and solvents or carriers therefor and all the other references are relied on to show the prior art of aerosol containers and technology, including the propellants used therein.

Barker discloses, as a known lachrymatory irritant material, chloracetophenone, various solvents for it including kerosene, and that a solution of the irritant can be disseminated into the air by spray action. The patent states:

> This compound, either in liquid or vapor form, causes intense eye irritation followed by a copious flow of tears. In addition, violent though temporary skin itching is produced. This substance produces violent irritation at a concentration which has no danger either to health or life.

One aspect of Barker's invention was to use as solvent a mixture of chlorpicrin, itself an irritant, and chloroform. As to the latter he says:

> The chloroform in these compositions, in addition to being an excellent solvent and assisting in atomization and vaporization, also causes a more vigorous as well as quicker irritation on the human eye, nose, and skin due to its activation of the pores.

---

[1]. This application is stated to be a continuation-in-part of application serial No. 672,380, filed October 2, 1967, which was a continuation of application serial No. 375,375, filed June 15, 1964.

Barker also teaches that the proportion of irritant to solvent carrier may be adjusted according to "the effects desired." In addition to use in warfare, it is disclosed that the compositions may be used for curbing criminals and for mob control or as a protection against burglars.

Williams discloses a solution of 10% chloracetophenone and 90% crotonaldehyde as a lachrymatory irritant and vesicant which can be dispersed from a spray tank pressurized with carbon dioxide to cause immediate disablement but no permanent toxic effect. He teaches further that the disabling effects of the solution are greater than those of either of the components alone, which is a form of synergism, and that the solution "quickly spreads over any surface with which it comes in contact and vaporizes the more readily."

The other references, collectively disclosing the state of the aerosol art, disclose aerosol cans with valves to produce sprays and use of a variety of propellants including various Freons, carbon dioxide, nitrous oxide, nitrogen, and various mixtures thereof, and that the spray characteristics can be varied by various combinations of propellants, propellant components, solvents, carriers, and nozzles.

### Appellants' Invention

Appellants' specification is a rather elaborate exposition on the subject of producing their "incapacitator," the results it is intended to accomplish, and numerous alternatives for each of the elements employed, but they summarize it all in a fairly concise statement, as follows:

The three essential components [of the composition contained in the aerosol container] may be described as:

I. A carrier solvent or carrier solvent blend,

II. An irritant, and

III. A pressurizing break-up gas.

They also optionally employ a fourth ingredient which they describe as "a phys-ical synergist and a chemical synergist which may be provided by the same substance," by which they appear to mean a solvent which reduces the amount of irritant required and insures its prompt activity, such as kerosene. After listing many alternative materials in each of these four categories, the following particular and "highly successful" composition is given, percent being by weight:

| | |
|---|---|
| Freon 113 | 88.34% |
| 1, 1, 1-trichloroethane | 5.52% |
| sulfuric acid treated kerosene | 3.55% |
| carbon dioxide | 1.75% |
| alpha-chloroacetophenone | .84% |
| | 100.00% |

Elsewhere in the specification it is stated that "The invention employs an active irritant which may be chosen from many known safe irritants, for example, 2-chloroacetophenone," and that the composition is "contained within and dispersed from a conventional pressure tight aerosol container having a manually operable valve and an orifice or nozzle * * *." In the above formula, the first two ingredients are the carrier solvent blend (I). The kerosene is the optional fourth "synergistic" ingredient. It is explained that the kerosene, or any of its substitutes, is treated with sulfuric acid to remove unsaturated aromatic compounds to enhance the stability of the total formulation. No novelty is alleged for this detail. The carbon dioxide is the break-up gas (III). The last item is the irritant (II).

There are only two independent claims. Claim 7 is directed to an aerosol container containing the specific composition of the above formula. Claim 8 is the broadest claim, upon which all other claims depend, and reads as follows:

8. In an assailant incapacitator for selective spray application of a chemical irritant to limited areas of the person of an assailant, a container, a manually operable valve therefor, a

nozzle in flow communication with said valve, and a spray composition within said container to be dispensed through said nozzle under control of said valve; said composition comprising by weight: between about 85 and 99.4% of a liquid carrier having a density of at least about 1.2 g./cc. and a boiling point of between about 60° and 130° F., between about 0.1 and 3% of a chemical nerve irritant dissolved in said carrier, and between about 0.4 and 3% of a gaseous propellant under multiple atmosphere pressure, a fraction of said gas being dissolved in said carrier and a fraction being undissolved; whereby upon actuation of said valve to subdue an assailant, a stream of carrier liquid containing said dissolved irritant and dissolved propellant gas is projected from said nozzle, the release of said gas from said carrier liquid causes the projected liquid to break up into droplets, and the body head of the assailant causes a rapid evaporation of said carrier liquid on contact therewith and consequent localized release of said irritant.

It will be observed that up to the colon this claim defines the mechanical part of a conventional aerosol device. The portion following the word "whereby" describes what happens when the aerosol container valve is opened and the contents of the container strike an "assailant," presumed to be a warm animal body. The remainder of the claim defines more broadly than claim 7 three of its four ingredients, the carrier, irritant, and propellant, of the composition which constitutes appellants' invention, the patentability of which is in issue.

### The Rejection

The only rejection before us is that the claimed invention is obvious under 35 U.S.C. § 103. The examiner so rejected all claims, 2–13. The board affirmed this rejection as to claims 3–9 and 11–13. The examiner also made a number of other rejections under § 112 but the board did not sustain them.

Claim 2 is in a special status. It was rejected, with others, on at least six grounds in the final rejection. In his Answer, the examiner repeated these rejections. He also suggested to the board that applicants' alleged failure to respond to some of his rejections in their brief before the board called for dismissal of the appeal as to several claims. The board opinion states:

* * * we are in agreement with him only as to claims 2 and 10, since we find that the brief contains no response at all to his holding that these claims are indefinite in the "additional ingredient" and "different gas," respectively. Accordingly, the appeal stands dismissed as to these claims, 2 and 10, under the provisions of Rule 192.

### OPINION

As above stated, appellants have withdrawn the appeal on claim 10. As to claim 2, no decision was rendered by the board on any of the grounds of rejection applied by the examiner. Under the circumstances of this case, we see no reason why we should take jurisdiction to review the dismissal of the appeal with respect to claim 2 and we therefore dismiss this appeal as to claim 2.

We shall now consider the § 103 rejection. We start from the admission by appellants that their composition is "contained within and dispersed from a *conventional* * * * aerosol container" (our emphasis) and that such a container will produce, with their composition, the kind of a spray they desire, "thereby exposing the assailant to the intended effects of the irritant ingredient." Patentability must, therefore, be found in the composition in the container, if it is to be found anywhere. In fact, the brief says at the beginning, "Appellants' invention is a composition," though that is not what the appealed claims call for.

The argument in this court, as before the board, starts with discussion of a "problem" which appellants solved. We have no doubt that they did solve a problem, perhaps many, as do all manufac-

turers who get ideas for new products which turn out to be successful. But the question here is not whether they solved a problem but whether in doing so they did something unobvious, in view of the skill of the art. What was the problem? Appellants tell us it was to put into the hands of a policeman (or other person) the wherewithal to subdue an assailant without causing serious bodily injury as is likely to occur through the use of a hand gun or a billy club. It had long since been known, of course, as the references show, to subdue mobs with tear gas but appellants had a new concept of its use, as they brought out very well in their brief before the board.

The conventional manner of using tear gas, appellants pointed out, was to saturate an entire area, the user protecting himself with a gas mask. "At the very heart" of their invention, they said, was "the discovery that if a *very little* irritant, such as tear gas, is placed on or near the face of a target he becomes incapacitated and it is not necessary to completely saturate an entire volume of air with the gas as is the previously conventional practice." This was appellants' concept—a selective weapon which can be directed at the face of an individual— or dog. No doubt it was a very good, or at least useful, concept; but was their claimed invention unobvious or did they merely apply the skill of the art to the implementation of their concept? We think they merely applied the knowledge of the art. Compare Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945). All of the ingredients of appellants' composition were to be found in the prior art either of tear gas technology or aerosol containers, the two arts they combined to produce their "MACE." They had to be selected and they had to be properly proportioned. Work was involved. But it seems to us the necessary knowledge was all available. No unexpected results were produced, notwithstanding the asserted, but unproved, commercial success.

Since the board summed up the situation in a manner on which we cannot improve, we quote below the essence of its holding:

Williams shows disabling spray compositions utilizing some of the irritants here disclosed and claimed, in the form of solutions thereof in crotonaldehyde with carbon dioxide as propellant. The Barker et al. patent is similar, using solvents meeting the specific gravity claimed and, especially in the case of chloroform, closely approaching the claimed boiling point range. The chloroform also is taught as an activator in causing more vigorous as well as quicker irritation. Riley shows spray compositions of general application, with solvents, and with propellants of the Freon and related types and of such gaseous types as carbon dioxide and nitrous oxide. The spray may or may not be of the "aerosol" type. Efford also is of general application, using various mixtures of Freon 12, Freon 11 and methylene chloride, with auxiliary propellants such as carbon dioxide and such solvents as the low-boiling hydrocarbons. The methylene chloride meets the specific gravity and boiling point requirements here, and is one of the co-solvents used here * * *. The similar disclosure of Webster et al. names as one of the solvents 1, 1, 1,-trichloroethane * * *. The cited publications are further informative as to the wide knowledge of the worker of ordinary skill in the art regarding spray characteristics, such as particle size and spray pattern or cone and the effect thereon of choice of propellants, solvents, nozzle design, pressure and emulsifying ingredients.

We agree with the board's conclusion on the § 103 issue that appellants merely applied the ordinary skill of the art in designing the composition to meet the requirements of a specific situation, such as the extent of the irritant or disabling effect.

Adverting to claim 2, we note that it is a dependent claim adding to claim 11, which in turn depends from claim 8, the provision that the carrier contains a small amount of an "additional in-

gredient" which increases the solvent capability of the carrier. Claim 3, which depends from claim 2, merely names nine compounds in Markush form from which said "additional ingredient" may be selected. The board, of course, held that claims 8 and 11 and 3 are all directed to obvious subject matter and it is clear to us that if it had passed on the § 103 rejection of claim 2, instead of merely dismissing it, it would inevitably have sustained the § 103 rejection.

Baldwin, J., dissented and filed opinion.

### Conclusion

The decision of the board affirming the rejection of claims 3–9 and 11–13 is affirmed. The appeal is dismissed as to claims 2 and 10.

Affirmed.